IN THE CIRCUIT COURT OF LAUDERDALE COUNTY, MISSISSIPPI
THE STATE OF MISSISSIPPI

Tyeasha Bell Lindsey; Hype Adventures, LLC,
an Alabama Limited Liability Company; Dena M. Malugen;
Jackson Hayes Malugen, a minor child, by his natural
parents and legal guardians, Joe and Dena Malugen;
Charles Thomas Malugen, a minor child, by his natural parents
and legal guardians, Joe and Dena Malugen,

**FILED**

JAN 07 2022

*Donna Jill Johnson*
CIRCUIT CLERK

PLAINTIFFS

VS.                                            CIVIL ACTION NO. ___22-CV-003(cw)___

Meridian Bevco, LLC, a Texas Limited Liability Company;
Rockstep Meridian Entertainment, LLC, a Texas Limited Liability
Company; Rockstep Capital, LLC, a Texas Limited Liability Company;
Rockstep Capital Corporation, a Texas Corporation;
Andy Isaac Weiner; Matthew Jeffery; Elisha D. Jeffery; and Gregg Borman, Sr.,
DEFENDANTS

## COMPLAINT
## (JURY TRIAL REQUESTED)

Comes now PLAINTIFFS, TYEASHA BELL LINDSEY (hereinafter referred to as "TY"), HYPE
ADVENTURES, LLC, an Alabama Limited Liability Company (hereinafter referred to as
"CONSULTANT"); DENA M. MALUGEN (hereinafter referred to as "DENA") , CHARLES THOMAS
MALUGEN, a minor child, by his natural parents and legal guardians Joe Malugen and Dena M.
Malugen (hereinafter referred to as "CHARLES"); JACKSON HAYES MALUGEN, a minor child, by
his natural parents and legal guardians Joe Malugen and Dena M. Malugen (hereinafter
referred to as "JACKSON"); by and through their attorney, Hon. K. Dustin Markham, and as for
their COMPLAINT against named above DEFENDANTS, herewith aver and in support thereof
would show the following, and state as follows:

### THE PARTIES

1.  PLAINTIFF TY is an individual, is over the age of 18 years and is sui juris, who resides in
    Lauderdale County, MS.
2.  PLAINTIFF CONSULTANT Is an Alabama Limited Liability Company, licensed to do business
    in Houston County, Al, and in the State of Mississippi, with its principal place of business in
    Houston County, AL.
3.  PLAINTIFF DENA is an individual, is over the age of 18 years and is sui juris, who resides in
    Houston County, AL.

1

<span style="color:red">**Exhibit 1**</span>

4.  PLAINTIFF CHARLES, is an 18-year-old minor, who resides in Houston County, AL.

5.  PLAINTIFF JACKSON, is an 18-year-old minor, who resides in Houston County, AL.

6.  Joe Malugen and Dena Malugen, who reside in Houston County, AL, are the biological father and mother, respectively, and legal guardians of PLAINTIFF CHARLES and PLAINTIFF JACKSON.

7.  DEFENDANT, MERIDIAN BEVCO, LLC (hereinafter referred to as "MERIDIAN BEVCO"), is a Texas Limited Liability Company, is licensed to do business in and has its principal place of business in Lauderdale County, MS.

8.  DEFENDANT, ROCKSTEP MERIDIAN ENTERTAINMENT, LLC (hereinafter referred to as "ROCKSTEP MERIDIAN"), is a Texas Limited Liability Company, and is licensed to do business in and has its principal place of business in Lauderdale County, MS.

9.  DEFENDANT ROCKSTEP CAPITAL, LLC (hereinafter referred to as "ROCKSTEP CAPITAL 1") is a Texas Limited Liability Company, with its principal place of business in Harris County, TX.

10. DEFENDANT ROCKSTEP CAPITAL CORPORATION (hereinafter referred to as "ROCKSTEP CAPITAL 2"), is a Texas corporation, with its principal place of business in Harris County, TX.

11. DEFENDANT, ANDY ISAAC WEINER (hereinafter referred to as "ANDY WEINER"), an individual, is over the age of 18 years and is sui juris, who resides in Harris County, TX and is also the Founder, President and agent of the DEFENDANTS MERIDIAN BEVCO, ROCKSTEP MERIDIAN, ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2.

12. DEFENDANT, MATTHEW JEFFERY, an individual, is over the age of 18 years and is sui juris, who resides in Jefferson County, KY, and is an employee and agent of the DEFENDANT companies.

13. DEFENDANT, ELISHA D. JEFFERY, an individual, is over the age of 18 years and is sui juris, who resides in Jefferson County, KY, and is an employee and agent of the DEFENDANT companies.

14. DEFENDANT, GREGG BORMAN, SR., an individual, is over the age of 18 years and is sui juris, who resides in San Joaquin County, CA and is an employee and agent of the DEFENDANT companies.

15. All of the individual DEFENDANTS are also currently employees and agents of one or more of the DEFENDANTS MERIDIAN BEVCO AND ROCKSTEP MERIDIAN, ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2.

16. The individual MATTHEW JEFFERY was not an employee and agent of DEFENDANT companies during the commission of the initial allegations of the Business Interference Count against him in this COMPLAINT before January 2021, but became an employee and agent of some of DEFENDANT companies soon thereafter.

17. The true names of the following additional DEFENDANTS who participated in the allegations set out in this Complaint as individuals or as agents of DEFENDANTS are at this time unknown to PLAINTIFFS, who therefore sue these DEFENDANTS under such fictitious names:

    •   JOHN DOE #1

- JOHN DOE #2

- JOHN DOE #3

- JOHN DOE #4

- JOHN DOE #5

PLAINTIFFS will seek leave of court to amend this COMPLAINT and Counts and insert their true names in place of their fictitious names when the same and their illegal actions against PLAINTIFFS have become known to PLAINTIFFS through discovery in this Action.

## JURISDICTION AND VENUE

18. This is a COMPLAINT for multiple intentional or reckless tortious and breach of contract actions, including (1) individual Defamation with multiple Counts of Defamation Libel Per Se and Slander Per Se, (2) Conspiracy to commit Defamation Libel Per Se and Slander Per Se, (3) Conspiracy to commit Wrongful Invasion of Privacy placing PLAINTIFFS in a Public False Light, (4) Conspiracy to commit Intentional Infliction of Emotional Distress, (5) Conspiracy to commit Deceitful Business Practices and Malicious and Intentional Fraud, (6) individual Deceitful Business Practices and Malicious and Intentional Fraud, (7) individual Wrongful Invasion of Privacy by placing Plaintiffs in a Public False Light, (8) individual Tortious Interference with Business Relations, (9) individual Intentional Infliction of Emotional Distress, (10) Breach of Contract under a written trade-name license agreement for failure to provide Licensor access to Licensee's books and records, (11) Breach of Contract under a written agreement for failure to provide financial statements and monthly net earnings statements, (12) Breach of Contract under a written agreement for failing to pay fixed consulting fee payments, (13) Breach of Contract under a written agreement for failure to pay variable consulting fee payments, (14) Breach of Contract for failure to pay consulting fees due to Promissory Estoppel and reasonable reliance to the PLAINTIFF'S detriment on DEFENDANT'S promises to pay PLAINTIFFS, (15) Breach of Contract under written agreement for failure to reimburse agreed upon expenses of PLAINTIFFS, (16) Breach of Contract under written agreement for actions in misuse of a Licensor's trade-name and trademark by Licensee and demand for termination of the License Agreement rights therein and damages for the loss of the business benefits for PLAINTIFFS through the remaining term of the agreement, (17) request for Preliminary and Permanent Injunctions against DEFENDANT'S further tortious conduct, (18) request for an award of Punitive Damages to punish DEFENDANTS outrageous tortious conduct, and (19) a request for reimbursement of litigation expenses, interest on amounts owed and attorney's fees as well as (20) a request for a Jury Trial of all Counts.

19. PLAINTIFFS have claims in excess of $200.00, exclusive of interest, costs and attorney's fees. This Court has original jurisdiction over this civil case for COMPLAINT pursuant to MS Code §9-7-81 (2013).

20. Venue in this action is proper according to MS Code §11-11-3 (2013). DEFENDANTS are subject to the personal jurisdiction in the State of Mississippi, Lauderdale County, as the DEFENDANT'S principal place of business is in, the DEFENDANTS conduct business in, and/or the alleged offending events and actions occurred in the State of Mississippi, Lauderdale County.

21. All of DEFENDANT'S alleged actions occurred less than 1 year prior to the date of this COMPLAINT.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

22. ANDY WEINER, as agent of ROCKSTEP CAPITAL 1, ROCKSTEP CAPITAL 2, MERIDIAN BEVCO and ROCKSTEP MERIDIAN, doing business at Uptown Meridian Mall in Meridian, Lauderdale County, Mississippi, initially contacted CONSULTANT, negotiated with and ultimately contracted with CONSULTANT to act as the sole consultant with ROCKSTEP MERIDIAN to help create a family entertainment center (hereinafter referred to as the "CENTER") in Uptown Meridian Mall in Meridian, MS, such Mall and retail space being owned by them or their affiliated Company, using CONSULTANT'S brand trade-name and trademark "Hype! Adventures" in a certain agreed upon exclusive geographic Territory including Lauderdale County.

23. TY is a resident of Meridian, Lauderdale County, Mississippi.

24. CONSULTANT is an Alabama Limited Liability Company located In Dothan, Houston County, Alabama, who performed retail consulting and management services for DEFENDANTS under written and oral agreements with DEFENDANT companies in Lauderdale County, Mississippi.

25. DENA is a resident of Dothan, Houston County, Alabama and was at the time of these incidents and is now the Owner and President of CONSULTANT.  She further is an owner of a Family Entertainment Center in Dothan, AL, similar to the CENTER.

26. Joe Malugen is a resident of Dothan, Houston County, Alabama and was at the time of these incidents and is now an employee of CONSULTANT.

27. TY is currently employed as the owner-operator of a retail business offering advertising, promotional and marketing products to local businesses in Lauderdale County, MS. TY was an employee of ROCKSTEP MERIDIAN and MERIDIAN BEVCO from March 2020 until February 4, 2021 as the Assistant General Manager and Events and Party Manager of the CENTER, and was responsible for the creation and management of all Events and Parties held at the CENTER for customers.  On February 4, 2021 her position was eliminated by MATTHEW JEFFERY, General Manager and agent of MERIDIAN BEVCO, her employer, and she immediately left her employment that day. TY was previously employed during the construction, build-out, pre-opening and post-opening operations of the CENTER.  While Events and Party Manager of the CENTER, TY grew the Event and Party business from no Events or Parties at opening date to average about 30 events per week thereafter while pursuing a sales goal to reach 40 events at the time she left employment, with excellent

4

reviews and responses from customers and employees regarding her planning and execution of said events.

28. CONSULTANT currently and was at the time of these alleged actions by DEFENDANTS, in the family entertainment center business of owning, and/or consulting with other family entertainment center owners and operators for the design, building, installation of and procuring of store equipment and the setup and operation of family entertainment centers. CONSULTANT further was engaged and now engages in owning a family entertainment center brand, trade-name, trademark and business plan for licensing or franchising its services and assets to licensees or franchisee third parties to own and operate such family entertainment centers under CONSULTANT'S "Hype! Adventures" brand, tradename and trademark and, in some cases, to use the the Hype! Adventure Business Plan for operation of family entertainment centers.

29. CHARLES, an 18 year old minor, is a partner along with JACKSON, an 18 year old minor, in a business named "Cool Cats Computers", formed in 2018, providing computer-based hardware and software design and build systems for retail store Point of Sale and Main Server Enterprise Management systems, Audio and Video music and entertainment design, build and management systems, Security Video Camera design, build and management systems, Axe Throwing game design, build and management systems, Specialty Laser/LED Lighting systems design, build and management systems, Virtual Reality VR game design, build and management systems and Laser Tag arena game design, build and management systems. CHARLES and JACKSON, while retained by CONSULTANT to work with DEFENDANTS, designed and installed in the CENTER the Point of Sale (POS) terminal systems, Clubspeed brand Entertainment Center Server Enterprise Management system, Virtual Reality (VR) management system, Laser Tag arena management system, Axe Throwing Management system, Specialty Laser Lighting system, Video Security Camera system, TV Monitor (45 Monitors) Video Entertainment management system, Go-kart racetrack management system and the FEC Brand of Audio Sound Distribution management system, prior to opening of the CENTER, all of which continue in operation today. CHARLES and JACKSON also installed most of the same type of systems installed in CONSULTANT'S affiliated family entertainment center located in Dothan, Al during 2018, which continues in operation today. The evidence will show that CHARLES and JACKSON are well experienced in design and install of all these types of systems, particularly Virtual Reality (VR) systems and Laser Tag systems, as opposed to the false, defamatory and damaging statements regarding their lack of VR business knowledge or ability concerning the CENTER VR system still in operation, published across the World-Wide Web to the general public by DEFENDANTS and their employed agent GREGG BORMAN, SR. in July 2021.

30. MERIDIAN BEVCO is doing business at a retail location in Uptown Meridian Mall in Meridian, Lauderdale County, Mississippi, and was licensed by CONSULTANT to use the trade-name to operate a family entertainment center under CONSULTANT'S branded

trade-name and trademark "Hype! Adventures" in a certain designated and agreed upon geographic Territory including Lauderdale County, MS.

31. ANDY WEINER, ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2 prior to the formation of ROCKSTEP MERIDIAN and MERIDIAN BEVCO, indicated to CONSULTANT'S President and Managing Member, DENA in early 2019, that they desired to create, own, and operate a family entertainment center similar to CONSULTANT'S existing affiliated family entertainment center designed built and installed by CONSULTANT'S employees prior to formation of CONSULTANT company and located in Dothan, AL during 2018.  DEFENDANTS stated that they wished to own their own name-branded store and wished to have full discretion regarding the trade-name, store business plan adopted, the management team used and store operations conducted there.  CONSULTANT offered to license the use of PLAINTIFF'S "Hype! Adventures" trade-name and trademark brand, registered with the U.S. Patent and Trademark Office, for this one proposed CENTER and to provide consulting services as the sole consultant to these DEFENDANTS in the design, creation, procurement, installation, opening and initial management of this one proposed CENTER, subject to these DEFENDANT'S full discretion as to final plans and choices for the CENTER.  There was no understanding or agreement between the Parties regarding any future centers or regarding the use of CONSULTANT'S trade-name and trademark brand in other centers, as these DEFENDANTS desired to operate all centers independently from CONSULTANT.

32. After negotiations between the Parties regarding the use of CONSULTANT'S trade-name and trademark "Hype! Adventures" by these DEFENDANTS and the use of CONSULTANT as the sole consultant to aid these DEFENDANTS in opening their first family entertainment center in one of their owned real estate shopping malls, CONSULTANT entered into those certain two agreements, both effective on June 28, 2019, named the "TRADE-NAME LICENSE AGREEMENT"  (attached as "Exhibit A" to this COMPLAINT) and the "AGREEMENT" for business consulting services (attached as "Exhibit B" to this COMPLAINT), with two new LLC companies Andy Weiner and other DEFENDANTS created to own and manage the CENTER operations, granting ROCKSTEP MERIDIAN the right to use the PLAINTIFF'S trademark and tradename brand "Hype! Adventures" (which right was later assigned to MERIDAN BEVCO) as well as the right of this DEFENDANT to solely choose, implement and operate any business plan the DEFENDANT chose for this family entertainment CENTER using the "Hype! Adventures" trade-name and brand, so long as it did not violate the other stated terms of the agreed upon TRADE-NAME LICENSE AGREEMENT and the AGREEMENT.

33. Use of the CONSULTANT'S existing Hype! Adventures Business Plan (hereinafter referred to as the "HYPE! BUSINESS PLAN') developed and owned by CONSULTANT, was not included as a requirement for DEFENDANT'S use under the AGREEMENT or the TRADE-NAME LICENSE AGREEMENT, but it was recommended by CONSULTANT to ROCKSTEP MERIDIAN for use in DEFENDANT'S new CENTER.  ROCKSTEP MERIDIAN, in their sole discretion, chose to initially adopt the HYPE! BUSINESS PLAN provided by the CONSULTANT for use in their CENTER, subject to any changes or termination as DEFENDANTS desired and this plan later continued in operation during the pre-opening and first 5 months period after the CENTER

opening for business, which was a total of 6 months in length.  CONSULTANT trained the General Managers and provided operating manuals to train all CENTER employees, however the DEFENDANT'S General Managers chose to train all other employees without CONSULTANT, which seemed odd to CONSULTANT as he was new to the business.  This Plan resulted in Sales and EBITDA/Net Monthly Earnings in excess of the projected financial operating budget previously agreed to between CONSULTANT and ROCKSTEP MERIDIAN prior to opening the CENTER.  ROCKSTEP MERIDAN assigned the TRADE-NAME LICENSE AGREEMENT to DEFENDANT MERIDAN BEVCO prior to opening the CENTER, with the consent of CONSULTANT.  See "Exhibit C" attached hereto for the original and amended Projected Financial Operating performance budgets of the CENTER agreed to by the Parties, which operating budgets were met or exceeded by the CENTER operations during the first 5 months after opening date.

34.  CONSULTANT recommended to MERIDIAN BEVCO an individual found and interviewed by CONSULTANT, to act as the initial CENTER General Manager (who was to be the overall on-site general manager of the CENTER operations) and this individual was then hired by MERIDIAN BEVCO several months before CENTER opening for business.  ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2 Chief Operating Officer employee, Tommy Stewart, solely supervised the CENTER General Manager. MERIDIAN BEVCO repeatedly stated and communicated to all employees of the CENTER that CONSULTANT'S employees working at the CENTER were not part of the CENTER management team and that the General Manager was reporting directly solely to Rockstep and Tommy Stewart and the other company DEFENDANTS, and not to the CONSULTANT.  CENTER employees were told not to follow any direct orders from CONSULTANT.  This General Manager reporting structure was agreeable to and not opposed by CONSULTANT because CONSULTANT was merely a business and management consultant to MERIDIAN BEVCO'S CENTER operation and CONSULTANT had no intentions at that time of ever general managing the CENTER.

35.  Immediately after CENTER'S opening in early September, 2020, it became apparent to both CONSULTANT and MERIDIAN BEVCO that a General Manager change was needed in the CENTER in order to continue successful operations.  MERIDIAN BEVCO, with the initial advice of CONSULTANT, changed the General Manager position by promoting a CENTER Assistant Manager to be the new General Manager on about September 15, 2020. CONSULTANT left the CENTER about September 25, 2021 and relinquished any on-site training and consulting duties at that time, but continued general consulting pursuant to the AGREEMENT.  The CENTER performed very well financially and exceeded operating budgets for about 30 days thereafter until October 15, 2020 when it again became apparent to both CONSULTANT and MERIDIAN BEVCO after observing the CENTER operations, the lack of employee training being conducted by the General Manager and the lack of accountability by managers to the Hype! Adventures center operating standards, that the new General Manager should also be replaced in order to improve daily operations.

36. CONSULTANT recommended to MERIDIAN BEVCO that a change in both General Manager and Assistant Manager of Operations was necessary. MERIDIAN BEVCO agreed to terminate the General Manager but refused to terminate the Assistant Manager of Operations because they believed that person could be a good manager for the CENTER, but indicated that the difficulties with the first two General Managers hired was likely problematic for future CENTER operations. CONSULTANT agreed and suggested to MERIDIAN BEVCO that MERIDIAN BEVCO'S supervision of the General Manager by Rockstep employee Tommy Stewart was not adequate, because the MERIDIAN BEVCO leadership had a lack of knowledge, training and experience regarding managing this type of business, which made holding the first two CENTER General Managers to any acceptable performance standards or accountability to standards very difficult. CONSULTANT stated that this was the biggest difficulty and hindrance to successful CENTER operations and would make it difficult finding and managing a satisfactory future general manager. CONSULTANT recommended that CONSULTANT could be the acting General Manager while a new General Manager could be sought, interviewed, hired and trained by CONSULTANT, that the Assistant Manager of Operations could be retrained by CONSULTANT and that it was not a good idea for MERIDIAN BEVCO leadership to directly oversee any CENTER General Manager until MERIDIAN BEVCO supervisor Tommy Stewart was more knowledgeable and experienced in running the CENTER operations and able to hold staff accountable to standards.

37. MERIDIAN BEVCO agreed and CONSULTANT assumed the General Manager position, working for free, without compensation, from about Friday, October 30, 2020 until January 31, 2021 and began retraining staff on Sunday, November 1, 2021. CONSULTANT and DEFENDANTS agreed for CONSULTANT to assume the General Manager position without salary compensation, but with full reimbursement from MERIDIAN BEVCO for travel, food and entertainment expenses incurred by CONSULTANT during this period of employment, which was anticipated to be about 90 days. CONSULTANT further agreed to this non-compensated general manager position because MERIDIAN BEVCO had previously agreed orally and in writing, that they would pay the remaining $25,000 consulting fee from the $100,000 consulting fee established in the AGREEMENT still outstanding from the CENTER construction and training period, plus the 10% of the monthly Net Earnings of the CENTER after opening consulting fee set out in the Agreement, as well as pay those construction period travel, food and entertainment expenses of CONSULTANT then remaining unreimbursed. CONSULTANT would never have agreed to remain in Meridian, MS and act as General Manager of the CENTER for 90 days with absolutely no salary compensation without these promises and agreements by DEFENDANTS to pay CONSULTANT and without relying to their detriment that these assurances of payment previously made by MERIDIAN BEVCO were true and would be made, along with the assurances of DEFENDANTS that all such amounts remaining unpaid to CONSULTANT would be paid promptly to CONSULTANT.

38. MERIDIAN BEVCO took about 20 days following CONSULTANT'S choice and recommendation of two new General Manager in training candidates, to hire the new

General Manager in training on about December 24, 2021. The Assistant Manager of Operations desired to be retained solely by Tommy Stewart and Andy Weiner, resigned within 10 days of CONSULTANT becoming the acting General Manager, citing that their other general obligations made continuing their employment impossible. Other CENTER Assistant Managers were then trained and promoted to replace this former manager.

39. On about January 25, 2021, about 5 months after opening of the CENTER and almost 90 days after CONSULTANT agreed to act as the CENTER General Manager and thirty days after CONSULTANT had begun training a third new General Manager who would hopefully assume the General Manager position within the next thirty to sixty days after his successful completion of the CONSULTANT'S 60–90-day training program, ANDY WEINER, ROCKSTEP MERIDIAN and MERIDIAN BEVCO telephoned CONSULTANT and spoke with DENA and Joe Malugen. ROCKSTEP MERIDIAN and MERIDIAN BEVCO, by ANDY WEINER, their agent, instructed CONSULTANT, as CENTER General Manager, by January 31, 2021, to turn over all general management and operations of the CENTER to ANDY WEINER'S chosen NEW MANAGEMENT TEAM headed by MATTHEW JEFFERY as General Manager along with his "wonderful family team of managers" as Andy Weiner described them. CONSULTANT had first met MATTHEW JEFFERY in 2019 at a DEFENDANT'S meeting in Houston, TX. ANDY WEINER falsely stated to CONSULTANT on this call that the CENTER had activity and game equipment customer safety issues, in spite of the CENTER'S outstanding customer safety record and was not an overall grade "A+" type of operation as previously noted and defined in DEFENDANT'S often published "25 Rockstep Ways" for conducting business. This decision by ANDY WEINER was made despite the fact of the CENTER having Sales of about $275,000 at that time in January 2021, and Sales of about $1,100,000 (above budgeted Sales expectations) with operating costs within agreed budgets, for the first 5 months of CENTER operations, with only 3 reportable customer safety incidents producing 2 minor injuries and 1 serious injury to customers in the CENTER during pre-opening operations and 5 months operations to that date. ANDY WEINER then stated DEFENDANTS would continue evaluating the existing General Manager candidate in training when asked by CONSULTANT of the employment status of that individual.

40. On February 1, 2021, MERIDIAN BEVCO and MATTHEW JEFFERY assumed sole general management of the CENTER and began to implement their "NEW ROCKSTEP BUSINESS PLAN" referred to in detail below, along with a "NEW MANAGEMENT TEAM" of managers referred to below, led by MATTHEW JEFFERY. MATTHEW JEFFERY had little or no overall experience in similar types of family entertainment center management, and neither MATTHEW JEFFERY nor MERIDIAN BEVCO or ANDY WEINER ever requested any operations, facility management or facility turnover training for MATTHEW JEFFERY or his NEW MANAGEMENT TEAM. CONSULTANT employees left the CENTER on January 31, 2021 and have not returned to the CENTER. CONSULTANT was available to and repeatedly offered to train the NEW MANAGEMENT TEAM and finish training the newest General Manager in training pursuant to the terms of the AGREEMENT; however, DEFENDANTS never made a request for such training.

9

41. This NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM was completely implemented in the CENTER by about March 31, 2021. The NEW ROCKSTEP BUSINESS PLAN included many of the different elements and different operational plans previously suggested and discussed to and with CONSULTANT for use in the CENTER by ANDY WEINER, ROCKSTEP CAPITAL 1, ROCKSTEP CAPITAL 2, ROCKSTEP MERIDIAN and MERIDIAN BEVCO during the initial 6 months of CENTER operation, when the CENTER was being consulted with or general managed by CONSULTANT. These suggested changes were opposed and rejected by CONSULTANT for implementation in the CENTER at that time because CONSULTANT was very confident that adopting these suggested changes would likely be highly detrimental to Sales and negative to the overall operational and financial performance of the CENTER.

42. The DEFENDANTS made about 45 changes to the HYPE! BUSINESS PLAN, essentially completely reversing the elements of the existing CENTER HYPE! BUSINESS PLAN, changing from a secondary market, value-based, all access ticket pricing strategy, to an urban market premium price, a la carte, ticket pricing strategy. The primary ROCKSTEP BUSINESS PLAN changes that detrimentally impacted the CENTER'S subsequent performance are the following: (1) about 30% overall price increases on tickets and food, (2) removal of karting and other games from the all-access admission ticket, (3) discontinued weekly specials and weekly discounted pricing, (4) discontinued special events and live Disc Jockey entertainment, (5) rejected a vast majority of the age 12-17 customer base due to requirement of parent/guardian constantly accompanying and supervising them in the CENTER, (6) discontinued adult beverages, which changed customer perception that CENTER was for all ages rather than just a children's venue, (7) slowed down the top speed and acceleration capabilities of the go karts which made them slow and undesirable to adult customers, (8) terminated the Events and Party Planner and Assistant Manager without replacing the position reducing Party and Event Sales from an average of 30 per week to 10 or less, and (9) failed to manage and oversee customer safety protocols, train, plan, repair or maintain equipment, or follow their own NEW ROCKSTEP BUSINESS PLAN or retain any elements of the old HYPE! BUSINESS PLAN.

43. The effect of adopting these numerous changes by MERIDIAN BEVCO, which MERIDIAN BEVCO was fully and legally entitled to do under the AGREEMENT and the TRADE-NAME LICENSE AGREEMENT, effectively terminated or reversed the majority of material elements of the previously successful HYPE! BUSINESS PLAN designed and put in place by CONSULTANT from September 1, 2020 to January 31, 2021 in the CENTER. MERIDIAN BEVCO immediately shut down for weeks, the Ropes Course, the Warp Wall, the Trapeze Foam Pit, and the Stunt Jump Tower activities and games for changes due to their erroneous alleged safety concerns, which would not have been required with proper management of the CENTER, as was done by CONSULTANT and managers in the first 6 months of operations, without any material issues. In addition, during this transition, MERIDIAN BEVCO elected to terminate and remove many of the trained and experienced existing CENTER employees, including the new General Manager in training, most Assistant Managers and shift leaders, as well as terminate many of the operational and

administration procedures put in place by CONSULTANT for daily operation of the CENTER during the first 5 months of CENTER operation.  In addition, several valuable trained and experienced existing CENTER employees became disgruntled and disagreed with MATTHEW JEFFERY as General Manager and his family of managers and voluntarily resigned their positions during this February and March business transition period.  This lack of experienced, trained managers caused major operational and safety problems for the CENTER in the subsequent months.

44.  The CENTER did not have significant declines in Sales and safety the first half of the month of February 2021, with the substantial changes initiated by MERIDIAN BEVCO and MATTHEW JEFFERY during mid-February 2021.  However, upon the elimination of the Party and Events Manager position on February, 4, 2021, the CENTER did suffer immediate negative operational repercussions among customers and employees in the mismanagement and disorganization of birthday parties, manifesting in negative social media reviews due to the inexperience of both MATTHEW JEFFERY and his NEW MANAGEMENT TEAM.  Thereafter, and in the second month of MERIDIAN BEVCO'S operations in March 2021, the CENTER began to see significant declines in monthly projected Sales, financial, operational and safety performance reversing its previous positive trends.  This downward accelerating trend in Sales, safety, cost controls and EBITDA profits became obvious in April, 2021 and has continued over the past 9 months from mid-February 2021 through November 2021, and continues today during MERIDIAN BEVCO'S, MATTHEW JEFFERY'S and GREGG BORMAN, SR.'S sole management of the CENTER.

45.  DEFENDANT GREGG BORMAN, SR., who never had met, had a relationship with or worked with CONSULTANT, DENA or CHARLES and JACKSON, was hired in July 2021 by DEFENDANTS and has apparently recently replaced the failed general manager MATTHEW JEFFERY and his team of family business associates, agents of MERIDIAN BEVCO and DEFENDANTS, during August and September of 2021 and now is the new General Manager of the CENTER.  But the CENTER business failures continue.

46.  CONSULTANT had previously opined many times prior to February 1, 2021 to MERIDIAN BEVCO, that many of these proposed business plan changes desired by MERIDIAN BEVCO would not be favorable or improve Sales, financial, operational or safety performance of the CENTER.  MERIDIAN BEVCO disagreed with CONSULTANT'S assessment of the likely resulting negative financial and operational or safety results of the CENTER and instead implemented such material changes.  However, negative overall results have subsequently occurred, accelerated and continue in the CENTER after CONSULTANT left the CENTER.

47.  ANDY WEINER, ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2, hired additional high-level finance and management employees in 2020 and January 2021 to help them develop their previously stated and intended plan for building additional family entertainment centers throughout the USA due to the successful and promising operational, safety and financial performance of the CENTER in 2020 and the first quarter of 2021, which exceeded all mutual expectations of all Parties hereto.

48. ANDY WEINER, ROCKSTEP CAPITAL 1 AND ROCKSTEP CAPITAL 2 made offers to CONSULTANT during November and December 2020, to purchase all rights, title and interest to CONSULTANT'S federally registered trademarks and trade-name "Hype! Adventures" brand for their sole use in operating their newly planned family entertainment centers. They stated that they liked the trade-name brand and they preferred not to build a new trade-name brand.  Said offer was declined by CONSULTANT in December 2020, without a counteroffer. Further, these DEFENDANTS offered to employ CONSULTANT in a consulting capacity similar to the existing AGREEMENT terms for two additional centers to be built and operated by these DEFENDANTS in 2021. This offer to purchase further consulting services from CONSULTANT was also declined by CONSULTANT without a counteroffer in December 2020. Attached as "Exhibit D" are the email conversations regarding these offers between the Parties.

49. In the email from ANDY WEINER on November 5, 2020, to DENA MALUGEN and Joe Malugen (attached hereto in "EXHIBIT D"), where he proposes a purchase of the Hype! Adventures intellectual property from CONSULTANT, he further acknowledges DEFENDANTS intent to pay the remaining unpaid $25,000 consulting fee still remaining unpaid today to CONSULTANT and a payment plan to do so, as well as acknowledging the monthly CENTER EBITDA earnings calculations and payments owed to CONSULTANT as set out in the AGREEMENT which remain unpaid today.

50. Subsequent to that rejection of these DEFENDANT'S two offers to purchase and consult by CONSULTANT, these DEFENDANTS undertook a willful, malicious plan and conspiracy during 2021 to falsely enrich themselves financially and reputation-wise in the eyes of their financial investors and associates, while at the same time to minimize their association with, to not pay their remaining obligations under the AGREEMENT, to damage the business of, to defame the characters, businesses and reputations of, to place in a public false light, and to effectively eliminate CONSULTANT, CHARLES and JACKSON and their businesses as a potential competitor for the DEFENDANTS' planned expansion of additional family entertainment centers.  These DEFENDANTS claimed to CONSULTANT about January 25, 2021, that they were not satisfied with the operation or financial results of the CENTER, in spite of record Sales revenues and operational cost controls and lack of material injury incidents in September, October, November, December of 2020 and January 2021, exceeding all agreed Sales projections and operating cost and injury projections agreed by these Parties.  These DEFENDANTS stated that they wanted their own CENTER management team to operate the CENTER, differently than CONSULTANT'S existing HYPE! BUSINESS PLAN for CENTER operations, and that they wanted to implement a NEW ROCKSTEP BUSINESS PLAN to ensure that the CENTER became what DEFENDANT'S President ANDY WEINER called a grade "A+ type of operation", which he stated the then present CENTER was not, despite the CENTER meeting or exceeding all operational budgets and goals established by all the Parties to measure CENTER performance since CENTER opening. DEFENDANTS thereafter proceeded to plan and conspire among all DEFENDANTS to repeatedly defame the business, reputation and character of, place PLAINTIFFS in a

12

public false light, attempt to damage the business of, and to breach their contractual obligations under the two written contracts with CONSULTANT, as set out in the Counts below.

51.   The facts will show that after 9 months of solely managing operations of the CENTER without CONSULTANT'S assistance, and after implementing their NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM operational changes in order to achieve their plan for their "25 Rockstep Ways", grade "A+" type of CENTER operation, DEFENDANTS have not achieved their grade "A+" goal for the CENTER and in fact have implemented what PLAINTIFFS or any reasonable person would adjudge today as a grade "F" type of CENTER operation, not "A+", which cannot be blamed on PLAINTIFFS as DEFENDANTS have tried to do.

52.   On or about January 21, 2021, DEFENDANT ANDY WEINER, Tommy Stewart and Tim Koltermann, all employees of ROCKSTEP CAPITAL 1, ROCKSTEP CAPITAL 2, ROCKSTEP MERIDIAN and MERIDIAN BEVCO, contacted CONSULTANT by telephone.  DENA and Joe Malugen, employees of CONSULTANT, were on the call.  ANDY WEINER stated that he had serious concerns about the overall management of CONSULTANT and the safety of the CENTER regarding the equipment for customer use, due to comments regarding management and safety from MATTHEW JEFFERY (who was not an employee or agent of DEFENDANTS at that time) after his trip to the CENTER to review operations in early January.

53.   Joe Malugen then stated that MATTHEW JEFFERY had not indicated any safety or management issues to Joe Malugen when talking to MATTHEW JEFFERY at the CENTER, nor was he aware of any material safety problems other than those known general issues with operating any family entertainment center offering physical games and activities, as there are always inherent recognized dangers with attempting any athletic activity along with normal wear and tear on equipment requiring daily and weekly assessment and repair when experiencing high customer traffic.

54.   The safety record of the CENTER had previously been discussed with this group on the call, and it had been noted to them several times previously, that only 3 incidents regarding customer safety, with only 1 of the 3 being serious, had occurred in the previous 6 months, from the time the equipment was installed and being used by employees or customers in August 2020 to late January 2021. Moreover, it had also been discussed that the CENTER general liability insurance broker had noted several times that he was surprised at the low number of incidents that had occurred during that time, in spite of the high CENTER Sales and customer traffic exceeding agreed projected sales and traffic for the CENTER.

55.   Joe Malugen asked these DEFENDANTS on the call for a list of the issues observed by MATTHEW JEFFERY on his visit to the CENTER, so CONSULTANT could address them.  No such information has ever been provided to CONSULTANT.

56.   MATTHEW JEFFERY before being an employee and agent of DEFENDANTS and thereafter while being subsequently hired as an employee and agent of DEFENDANTS, subsequent to his trip to the CENTER January 7, 2021, libeled and slandered CONSULTANT and illegally

13

interfered with the business relationship of the Parties by stating to the other DEFENDANTS and to other third parties, that the equipment in the CENTER, designed, purchased, installed, managed and maintained during CONSULTANT'S term as either consultant or general manager of the CENTER, was unsafe for use for its intended purpose by any person, when in fact such equipment had performed very well and was managed and maintained very well for the 6 months of its lifespan in the CENTER when used as a part of the HYPE! BUSINESS PLAN and managed by the then existing CENTER management team trained by CONSULTANT. The evidence will show that any physical activity or game is inherently dangerous to users if not managed by a competent management team and if not supervised properly for customer use and if employees are not trained by management to properly use and monitor such equipment. Attached as "Exhibit E", are the email conversations evidencing the desire and plan of MATTHEW JEFFERY to engage in the family entertainment center business over a year before these incidents and his business and financial motives and desires to better himself by committing this defamation and illegal interference in a business relationship by MATTHEW JEFFERY against CONSULTANT.

57. Evidence will show MATTHEW JEFFERY'S aforementioned conduct was undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge. MATTHEW JEFFERY'S aforementioned conduct evidences a conscious disregard for the rights of CONSULTANT, CHARLES and JACKSON and has caused them substantial harm.

58. On or about February 23, 2021, 4 weeks after removing CONSULTANT as CENTER General Manager, ANDY WEINER, individually and as agent of ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2, telephoned CONSULTANT'S President DENA and stated that he was still interested in purchasing the trade-name and trademark of "Hype! Adventures" so that ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2 could develop more individual family entertainment centers across the USA. He further stated that they liked the "Hype! Adventures" trade-name brand, preferred not to build a new trade-name brand, and wanted to know if there was a price for which CONSULTANT would sell it. He stated that the racetrack go-karts had been a "disaster" and that the CENTER'S business was "about to collapse." He further stated that "the Hype! Business concept was good but the execution was not A+ and was lacking overall and he had to make changes to fix and improve things in the store." DENA stated that she disagreed and did not understand such a statement, that the operational results were better than the agreed upon budgets, that even now February was meeting Sales budgets, that anything in the CENTER can be improved upon and that though he may not have liked CONSULTANT'S management style, the results were indisputably successful while CONSULTANT managed the CENTER up to January 31, 2021. DENA stated that CONSULTANT would possibly sell the trade-name "Hype! Adventures" for $250,000 in cash. ANDY WEINER stated that he would consider that, but never responded later to this proposal to sell the trade-name.

59. ANDY WEINER also falsely told DENA on or about February 23, 2021, that he would never use the go-karts CONSULTANT recommended, purchased and used in the CENTER by the DEFENDANTS, because the go-karts in the CENTER were a "disaster" and he would not use

14

those brand karts and manufacturer again in any of his centers in the future.  He clearly lied to DENA about the go-kart's fitness for their purpose, because ANDY WEINER soon thereafter instructed MATTHEW JEFFERY, the General Manager, to contact the same manufacturer of the go-karts and ordered, purchased and had delivered to the CENTER, 7 more of the same "disaster" brand of go-karts from this same manufacturer, which karts are all now currently present in the CENTER 9 months after ANDY WEINER'S statement and 15 months after being placed in service.

60.  In a subsequent call on May 13, 2021, ANDY WEINER, individually and as agent of ROCKSTEP CAPITAL 1, ROCKSTEP CAPITAL 2 and MERIDIAN BEVCO, stated to CONSULTANT and DENA that the Sales success of the CENTER while CONSULTANT managed it was what he considered to be "synthetic revenue" due solely to the local community interest in the grand opening period of the CENTER and that the CENTER could not continue Sales at such a high rate or successfully without making his desired ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM changes because the "store was about to fall apart while CONSULTANT managed it."  Dena stated to him that she disagreed and that there were no indications of mismanagement or of anything falling apart when CONSULTANT left the CENTER on January 31, 2021. The evidence will show that the CENTER continued to perform well temporarily for about 2 months after PLAINTIFFS left the CENTER management January 31, 2021, until the end of March 2021, when DEFENDANTS completed instituting their NEW ROCKSTEP BUSINESS PLAN, such that ANDY WEINER and ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2, on or about March 17, 2021, about 45 days after PLAINTIFFS had left the CENTER management, in direct contradiction of his very negative statements about the CENTER to Dena Malugen, announced to the public in a Hot Springs, AR press newspaper article, that DEFENDANTS were excited about the business concept and intended to build another Center similar to the existing Meridian CENTER in their owned Uptown Hot Springs Mall, in the Sears space plus other spaces which the DEFENDANTS owned there.  See "Exhibit F" attached hereto for a copy of said local Newspaper Press Announcement.

61.  The facts will also show that MATTHEW JEFFERY, CENTER General Manager, in February and March 2021 was so confident in the CENTER successful operational and financial performance that he told several employees of the CENTER while they were on work duty, that he intended to lead the opening of a similar family entertainment CENTER in Birmingham, Al.

62.  The facts will show that Adair Jeffery, wife of MATTHEW JEFFERY, and part of the NEW MANAGEMENT TEAM, bragged to CENTER employees on March 20, 2021 about how great the CENTER was performing.

63.  The facts will also show that DEFENDANTS were so satisfied and pleased with the operational and financial performance of the CENTER that they notified all the CENTER employees on March 8, 2021, that they would award a $200 cash bonus to any employee who suggested a new alternative trade-name that would be chosen by DEFENDANTS for

their own new family entertainment centers they planned to build, as they did not intend to use the "Hype! Adventures" trade-name for future centers.

64. The facts will show that DEFENDANTS were planning to build more Centers at least up until June 2021, while at the same time falsely contending to CONSULTANT that the CENTER Operations were "about to collapse" when CONSULTANT left the CENTER management.

65. The facts will show that DEFENDANTS only ceased their plans to build more centers following their realization in about June or July 2021, that the NEW ROCKSTEP BUSINESS PLAN and the NEW MANAGEMENT TEAM implemented in February and March 2021, were unquestionable business failures, as Sales had dropped, customer safety and park insurability had collapsed, cost controls had ended and EBITDA/Net Monthly Earnings had dropped to unprofitable levels, making the expansion of their NEW ROCKSTEP BUSINESS PLAN by MATTHEW JEFFERY and the NEW MANAGEMENT TEAM impossible either operationally or financially.

66. The facts will show that ANDY WEINER'S statement that the "business was about to collapse" in February 2021 was false and made absolutely no business sense given the fact that CENTER had Sales of $275,000 in January, far exceeding agreed upon Sales projections and had generated in the first 5 months of operations over $1.1 million in Sales, again far exceeding agreed upon projections. In fact, CONSULTANT had told DEFENDANTS in January, 2021, that the CENTER could likely achieve above projection Sales of $2,700,000 for the first 12 months of operation based on Sales trends. This upward trend trajectory did not turn heavily downward until April 2021, after the termination of the HYPE! BUSINESS PLAN and existing management team, the adoption of the NEW ROCKSTEP BUSINESS PLAN (which took about 60 days to implement) and hiring of MATTHEW JEFFERY and the NEW MANAGEMENT TEAM to manage the CENTER after CONSULTANT ceased management of the CENTER on January 31, 2021. Attached as "Exhibit G", and "Exhibit H" are the emails and correspondence between the Parties evidencing the successful overall Sales performance of the CENTER and the consulting services provided by CONSULTANT while CONSULTANT was either consultant or General Manager of the CENTER.

67. The facts will show that all these statements by ANDY WEINER to CONSULTANT, and likely made to third party MATHEW JEFFERY before MATHEW JEFFERY became an agent and employee of DEFENDANTS and to other third parties to be identified after further discovery in this case, that the CENTER was "mismanaged by CONSULTANT", "karts were a disaster", was the "store was about to collapse", and that ANDY WEINER was going to "fix things to save the store", were false, misleading, and likely defamatory to CONSULTANT, and intended to convince CONSULTANT (1) not to pursue their legal rights under the two agreements between the Parties and, (2) to not pursue DEFENDANT'S compliance with agreements and promises DEFENDANTS had made with CONSULTANT and finally, (3) to ensure DEFENDANTS could deflect all risks of future CENTER business failure and fault due to their subsequent planned business decisions from DEFENDANTS to appear to be the fault of CONSULTANT and damage CONSULTANT'S business.

68. On or about February 12, 2021, MATTHEW JEFFERY, individually and as agent of DEFENDANTS made a telephone call to Richard Maylott, owner of Northeast Insurance Center in Cape Coral, Florida. Northeast Insurance Center was the general liability insurance agent for the general liability insurance carrier of the CENTER at that time. MATTHEW JEFFERY told Richard Maylott that there had been a customer incident and injury in the go-kart and racetrack area of the CENTER the prior day and he called to report the incident to the agent and carrier. Richard Maylott asked if there was an Incident Report and a security camera video of the incident available so Richard Maylott could provide those to the insurance carrier.

69. MATTHEW JEFFERY replied to Richard Maylott that he had reviewed and observed the CENTER video security camera saved records and data base at the time of the incident and injury, but there was no security camera video of the incident and injury observable in that incident location nor any retained video because "about half of the security cameras covering the racetrack area are not working." Richard Maylott answered that Joe Malugen, an employee of the CONSULTANT had told Richard Maylott previously that there were many video security cameras working all over most of the CENTER areas. MATTHEW JEFFERY denied that the video cameras were working and stated he did not have a video of the incident and injury due to about half of the video security cameras in the racetrack for go-karts were not working. These statements concerned Richard Maylott who was the representative of the general liability insurance carrier and these statements raised questions in his mind about the truth, veracity and character of Joe Malugen and CONSULTANT, who had previously told him there were a large number of video security cameras available and working to cover most areas of the CENTER. Richard Maylott was then previously aware that Joe Malugen and CONSULTANT were no longer working on-site at the CENTER after January 31, 2021.

70. Richard Maylott finished his telephone conversation with MATTHEW JEFFERY after getting details of the incident and immediately telephoned Joe Malugen, telling him that he was concerned when told by MATTHEW JEFFERY that about half the video security cameras in the racetrack area of the CENTER were not working. Richard Maylott stated to Joe Malugen that such an occurrence would reflect poorly on the CENTER, on Joe Malugen and CONSULTANT with the current general liability insurance carrier because working video security cameras were an important condition of the insurance carrier being willing to assume the general liability risk for the CENTER. Richard Maylott told Joe Malugen that he remembered Joe Malugen previously telling him that the video security cameras were in place and functioning properly and that he had believed that statement by Joe Malugen. He stated that Joe's statement was just contradicted by the statements of MATTHEW JEFFERY. Joe Malugen then responded that there were 86 video security cameras in the CENTER when he left the CENTER on January 31, 2021, that 5 were not functioning when he left the CENTER, but that those cameras could and should be repaired by any General Manager in charge of maintaining the CENTER. Richard Maylott stated that MATTHEW JEFFERY'S allegation, if true, would reflect poorly on the CONSULTANT and Joe Malugen

and affect their business character and reputation for future dealings with Richard Maylott and any insurance carriers.  Joe Malugen told Richard Maylott that there were on that date 29 video security cameras in the racetrack go-kart area consisting of about 30,000 square feet which is about industry standard camera coverage recommended for such an amount of square footage.  Malugen stated he would inspect the video security system records for problems but that it is possible that a small portion of some areas of the CENTER might not be covered fully by the 86 cameras.  The telephone conversation then ended.

71.  Later that day, Joe Malugen telephoned Richard Maylott and stated to him that all 29 video security cameras in the racetrack were functioning properly, that there might be 1 or 2 not functioning but that certainly 95%-98% of the video security cameras were functioning properly in the racetrack go-kart area and the entire CENTER at the time of the injury incident and were presently functioning that day.  Richard Maylott stated that either Joe Malugen or MATTHEW JEFFERY was untruthful about the video security cameras being working, and that MATTHEW JEFFERY is the General Manager of the CENTER and Richard Maylott would have to accept his statement that "about half of the video security cameras are not working."  Richard Maylott said he had no choice but to accept the statement by MATTHEW JEFFERY.  Joe Malugen then stated to Richard Maylott that MATTHEW JEFFERY was lying and that Joe Malugen could prove he was lying because he had made hard copies of the video camera records for that day.  Richard Maylott stated that he needed the video security cameras to be working properly and he was disappointed that this had become an issue that reflected badly on CONSULTANT and Joe Malugen's reputation and character.

72.  MATTHEW JEFFERY'S statement was false and slanderous and part of a conspiracy of DEFENDANTS to defame CONSULTANT regarding PLAINTIFF'S installation and management of the video security system in the CENTER.  In fact, 81 video security cameras were working in the CENTER on the day of the injury incident, 29 were working in the racetrack go-kart areas, because CONSULTANT monitored all the security cameras on a daily basis and had observed them and recorded the scenes that particular day and observed every day since CONSULTANT left the CENTER.  The 29 cameras are about 95-98% of all cameras in that racetrack go-kart area and the 29 number of cameras is considered an industry standard for that size square footage area.  Any statement that about half the cameras were not working at the time of this incident is patently false and defamatory, as there are 81-82 cameras working in the park even up to the date of this COMPLAINT.

73.  Evidence will show MATTHEW JEFFERY'S aforementioned conduct was undertaken with malice or reckless disregard, in a state of mind, which evidences hatred, ill will, or a spirit of revenge.  MATTHEW JEFFERY'S aforementioned conduct evidences a conscious disregard for the legal rights of CONSULTANT, CHARLES and JACKSON and has caused them substantial harm.

74.  ELISHA D. JEFFERY, individually and as agent of MERIDIAN BEVCO, met with Christopher Rhodes, sales representative of Ben. E. Keith Food Distributors, Inc., supplier for the CENTER, on or about February 15, 2021, regarding the food supply order for the café in the CENTER.  The conversation occurred in the café of the CENTER.  ELISHA D. JEFFERY who was acting as the manager for the café and was placing food orders, stated in this conversation

that CONSULTANT'S café design and layout was faulty in design and operation, that the menu content was wrong, that she was making needed changes and that CONSULTANT had obligated MERIDIAN BEVCO to several long-term food supply contracts with suppliers and vendors that she claimed were "bad long-term agreements" putting MERIDIAN BEVCO in an "upside down " position both financially and operationally that she "would like to, but could not terminate and replace." Christopher Rhodes asked ELISHA D. JEFFERY what those agreements consisted of, but she declined to detail them. Christopher Rhodes contacted CONSULTANT employee Joe Malugen a few days after this conversation and stated, that ELISHA D. JEFFERY "doesn't think you know what you are doing in the food business." He proceeded to tell Joe Malugen what ELISHA D. JEFFERY had said. He asked Joe Malugen what were the long-term agreements for food supply that ELISHA D. JEFFERY was claiming Joe Malugen had damaged MERIDIAN BEVCO with, because ELISHA D. JEFFERY was claiming that Joe Malugen did not know the food business and had obligated MERIDIAN BEVCO to several bad, binding long-term agreements. Joe Malugen stated to Christopher Rhodes that ELISHA D. JEFFERY was making false and defamatory statements because there were no long-term agreements for food supplies, except the ICEE frozen drink machine, which was the Number 1 item seller in the café and a very favorable business agreement with the most popular frozen drink company in the USA. Christopher Rhodes noted to Joe Malugen that the Sales in the Café in the past had been better than he had expected, so he did not understand how ELISHA D. JEFFERY intended to improve Sales. Christopher Rhodes ended the conversation stating that "well, ELISHA sure says you created some bad contracts for Hype!" "She is trying to make you look bad."

75. The facts will show that Joe Malugen or CONSULTANT did not bind MERIDIAN BEVCO to any bad long term food supply agreements from a financial or operational standpoint and that the café design and operation operated successfully under the "HYPE! BUSINESS PLAN" and old management team, prior to CONSULTANT leaving daily management of the CENTER. The facts will show that ELISHA D. JEFFERY was part of a plan to conspire to falsely defame CONSULTANT by slander per se to a third party in the food supply industry and damage CONSULTANT'S reputation, business and character. The facts will also show that ELISHA D. JEFFERY'S NEW ROCKSTEP BUSINESS PLAN for the café was subsequently a complete business failure and that food Sales in the café dropped substantially following her hiring, her changes of food suppliers, menu items and food pricing soon after she assumed management control of the Café.

76. Evidence will show ELISHA D. JEFFERY'S aforementioned conduct was undertaken with malice or reckless disregard, in a state of mind, which evidences hatred, ill will, or a spirit of revenge. ELISHA D. JEFFERY'S aforementioned conduct evidences a conscious disregard for the rights of CONSULTANT, and has caused them substantial harm.

77. On or about February 7, 2021, one week after CONSULTANT had left the management of the CENTER and several days after MATTHEW JEFFERY individually and as agent for MERIDIAN BEVCO, as General Manager had released Tyeasha Bell Lindsey (TY) from

employment as Events and Party Planner Assistant Manager, the CENTER hosted a party for a customer named "Nathan Barry."

78. Nathan Barry was very disappointed with the party experience provided by General Manager MATTHEW JEFFERY at the CENTER on that day, so he proceeded thereafter to publish and post on the Facebook.com Hype Adventures Meridian page website on the World-Wide Web, available to billions of Facebook users, a negative customer review of the CENTER business, published as follows:

> "Nathan Barry doesn't recommend Hype Adventures
>
> Most unorganized and unprofessional place.  Staff is a complete joke, and I do not recommend ever having a party there.  Especially for the price of it.  Rude employees.  Hostess never to be found.  Had an hour and a half of our 3 hour party wasted from sitting around and waiting.  Room was not even close to being in order upon arrival.  Couldn't even get food or drinks that was paid for ahead of time, or even get utensils to eat with.  My daughters birthday was a complete unorganized mess because of the staff.  To top it off half of the stuff in there was blocked off or out of service."

79. On or about March 14, 2021, five weeks later, MATTHEW JEFFERY finally got around to checking his CENTER Facebook Hype Adventures customer webpage, saw Nathan Barry's negative customer review of the CENTER, and responded to Nathan Barry and the rest of the billions of World-Wide Web users by publishing and posting the following on the same Hype Adventures Meridian webpage on Facebook.com, the following response:

> HYPE ADVENTURES
>
> Hi Nathan, We are sorry that you had a bad experience.  We are now under new management with many new staff.  Give us a try again sometime.

80. MATTHEW JEFFERY'S response was false, defamatory and libel per se, and placed in a false light to the public, the CONSULTANT, as well as former Events and Party Manager employee TY, because MATTHEW JEFFERY had assumed management of the CENTER on February 1, 2021, and obviously attempted to place fault and blame for Nathan Barry's bad party experience on February 7, 2021, away from himself and onto the prior management team which included CONSULTANT and TY, who were no longer employed at the CENTER at the time of the disastrous Nathan Barry party on February 7, 2021.  MATTHEW JEFFERY was fully aware that the CENTER was under his personal control and management and not under any other "new management" at the time of Nathan Barry's party on February 7, 2021.  This action by MATTHEW JEFFERY was intentional, with malice against CONSULTANT and employee TY, as the community of Lauderdale County, MS was generally familiar with CONSULTANT and TY as the previous "management" team replaced by MATTHEW JEFFERY and his "NEW MANAGEMENT TEAM."

81. Evidence will show MATTHEW JEFFERY'S aforementioned conduct was undertaken with malice or reckless disregard, in a state of mind, which evidences hatred, ill will, or a spirit of revenge.  MATTHEW JEFFERY'S aforementioned conduct evidences a conscious disregard for the rights of CONSULTANT and TY, and has caused them substantial harm.  Attached as "Exhibit I" are the copies of the statements published on Facebook.com by customer "Nathan Barry" and MATTHEW JEFFERY regarding PLAINTIFFS poor performance as managers.

82. CONSULTANT contacted DEFENDANTS on multiple occasions by email after April 2021, due to the serious concerns CONSULTANT had for the obvious failure of the NEW ROCKSTEP BUSINESS PLAN, the failures of the NEW MANAGEMENT TEAM and the foreseeable failing performance of the CENTER.  Attached as "Exhibit J" are the copies of emails between CONSULTANT and DEFENDANTS from April to August 2021 evidencing the growing concerns of CONSULTANT and the warnings to DEFENDANTS about what was happening in the CENTER and CONSULTANT'S projected disastrous operational and financial outcomes from their actions in the CENTER. The evidence will show that CONSULTANT'S projections for the declining performance of the CENTER have come to fruition presently as CONSULTANT projected. DEFENDANTS consistently rejected these warnings, complained about CONSULTANT'S past services to them, despite the great financial and operational success of the CENTER, and continued implementing their failing business and management policies begun February 1, 2021.  DEFENDANTS continued to falsely place all blame and fault for their failing results on CONSULTANT'S HYPE! BUSINESS PLAN and original CENTER management team, when in fact they have not been utilized in the CENTER for about 9 months since January 31, 2021.

83. After a May 6, 2021 email to DENA MALUGEN from ANDY WEINER requesting further discussions, during May 6, May 13, May 24,  May 27, May 31, June 4, June 8, June 13 and June 21, 2021, DENA MALUGEN sent a series of emails to ANDY WEINER (attached as "Exhibit J" hereto) expressing increased concerns of PLAINTIFFS about the way the CENTER was being managed by MATHEW JEFFERY, the downward spiral in monthly Sales occurring in the CENTER, and the fact that DEFENDANTS were ignoring the oral and written warnings of PLAINTIFFS to DEFENDANTS about the mismanagement and failing ROCKSTEP NEW BUSINESS PLAN of the CENTER the previous 4 months.  DENA MALUGEN further demanded full compliance by DEFENDANTS with all agreements between the parties as DEFENDANTS were in breach of these agreements.

84. ANDY WEINER requested a phone call with CONSULTANT on June 7, 2021, and such call occurred on June 10, 2021.  In that call, between ANDY WEINER, Tim Koltermann, and Tommy Stewart, employees and agents of DEFENDANTS, and DENA MALUGEN, and Joe Malugen, representing CONSULTANT, the CONSULTANT by Joe Malugen expressed that MATTHEW JEFFERY and his family of managers in the CENTER were some of the very worst and incompetent retail store managers he had ever witnessed in spite of managing 5,500 retail stores and working with many thousands of retail store managers in his career. DENA MALUGEN further stated the many changes effectively now treated the store as if it were in an urban market rather than a value conscious secondary market.  Tim Koltermann

stated that DEFENDANTS had consulted with several "family entertainment center industry veterans" the past 4 months, regarding the changes they had made in the CENTER with the NEW ROCKSTEP BUSINESS PLAN. DENA MALUGEN stated that MATTHEW JEFFERY was incompetent as the General Manager of the CENTER. ANDY WEINER ASKED "Why is he incompetent?" DENA MALUGEN responded saying "no competent new general manager, especially if inexperienced in the industry, would take over that CENTER without requesting training and information from the people who successfully designed and managed the CENTER previously."

85. ANDY WEINER'S final email to DENA MALUGEN was on June 26, 2021, in which he acknowledged owing CONSULTANT the reimbursements request submitted to DEFENDANTS and promised payment in the future, as well as promised to provide financial statements for the CENTER operations promptly. No reimbursement payment or presentation of financial statements by DEFENDANTS to CONSULTANT has occurred.

86. During May and June, 2021, DEFENDANTS recognized that their new plans and changes to the CENTER were going awry very quickly as CONSULTANT had predicted. Due to the intense pressure DEFENDANTS were under to explain to their employees, partners, investors and lenders the reasons for the collapse in the CENTER performance, DEFENDANTS, in order to protect their own character, business and reputations, which would otherwise be heavily damaged if the CENTER continued to decline and fail, decided to further sacrifice CONSULTANT'S character, reputation and business by making CONSULTANT the false scape-goat for DEFENDANT'S horrible CENTER business decisions and results. In fact, DEFENDANTS then went even further than their prior defamations against PLAINTIFFS, by planning and carrying out an even higher illicit degree of tort conspiracy, inventing an even worse damaging defamation against CONSULTANT after the CENTER operational and financial results further collapsed during June and July 2021.

87. DEFENDANTS then went from an ill-willed conspiracy strategy of defaming CONSULTANT and DENA by publishing oral and written words imputing a want of integrity or capacity, both mental and pecuniary, in the normal conduct of CONSULTANT'S profession, trade and business, to an even more egregious, offensive and criminal-based type of defamation, by publishing additional written words to a WORLD-WIDE WEB audience including the family entertainment center industry veterans group of 2,200 businesses, of which CONSULTANT and TY are members, which were and are CONSULTANT'S existing, current and potential business industry customers. DEFENDANTS through their newly hired agent and employee GREGG BORMAN, SR., began imputing onto CONSULTANT and DENA the guilt or commission of multiple acts of the criminal offense of Fraud involving moral turpitude and infamous punishment alleged against CONSULTANT and DENA. These allegations against CONSULTANT and DENA are shocking to the conscience, a grave violation of socially acceptable behavior and are vile and depraved acts to be condemned in a civil society.

88. Four prominent dictionaries define the word "mislead" in the following ways:

    1. Merriam-Webster Dictionary states,
      "To lead in a wrong direction or into a mistaken action or belief often by deliberate deceit", such as "His comments were a deliberate attempt to mislead the public."

2.  Vocabulary.com states, "Use the verb mislead to describe what you're doing when you don't tell the whole truth, or when you let someone believe something false."

3.  Dictionary.com states, "to lead or guide wrongly, lead astray, to lead into error of conduct, thought or judgement, to be misleading; tend to deceive

4.  Cambridge Dictionary states, "to cause someone to believe something that is not true."

89.   GREGG BORMAN'S and DEFENDANT'S published words by their common usage which claimed that CONSULTANT and DENA had committed illegal criminal and civil fraud in "misleading" and damaging DEFENDANTS by lying to them regarding the recommended business plan for the CENTER which DEFENDANTS subsequently adopted in the CENTER. They further published regarding CONSULTANT and DENA that they "could not believe what some consultants do and suggest", by creating "backend deals" for CONSULTANT'S benefit with DEFENDANT'S supplier vendors, alleging words by their common usage that CONSULTANT was committing repeated acts of illegal criminal Bribery, illegal criminal Corruption, & illegal criminal financial Kickbacks, by negotiating with DEFENDANT'S supplier vendors to pay illegal "gratuities" to CONSULTANT and DENA to secure the vendor supplier's sales of equipment to DEFENDANTS, and then CONSULTANT and DENA illegally accepted financial payments and remunerations from vendor equipment suppliers of DEFENDANTS in the CENTER while fraudulently recommending these same equipment suppliers to DEFENDANTS for purchases of CENTER equipment.  These are clearly vile false claims of legally actionable civil and criminal fraud by CONSULTANT and DENA against DEFENDANTS, potentially if true, subjecting CONSULTANT, DENA and their employees to Fraud civil liability monetary damages to the DEFENDANTS as well as likely criminal incarceration and prison time for CONSULTANT'S employees and DENA for these infamous criminal fraud offenses allegedly conducted against DEFENDANTS.  These allegations are completely false and deeply damaging to CONSULTANT and DENA.

90.   GREGG BORMAN, SR., individually and as an agent of DEFENDANTS, in July 2021, further falsely, unconscionably and maliciously and as part of a conspiracy with DEFENDANTS, defamed CONSULTANT, DENA, CHARLES and JACKSON, by defamatory libel per se and published multiple public statements placing CONSULTANT, DENA, JACKSON and CHARLES in a False Light on www.Facebook.com member page named "Gregg Borman Sr", available to billions of World-Wide Web users as well as PLAINTIFF'S 2,200 industry contemporaries and associates, including even CONSULTANT and TY as previous and present members of FACEBOOK FEC Operators group, on the Facebook FEC Operators Group page account, which has over 2,200 industry members (including TY and CONSULTANT) across the World-Wide Web, which damaged their character, reputations and business.  GREGG BORMAN, SR. and DEFENDANTS published statements that CONSULTANT and DENA had bribed, corrupted vendors and accepted financial kickbacks from equipment vendors utilized in the CENTER by "Backend Deals", had mislead and defrauded MERIDIAN BEVCO and ROCKSTEP MERIDIAN during the consultancy period, in specific violation of the AGREEMENT which would constitute fraudulent criminal conduct by PLAINTIFFS against MERIDIAN BEVCO and

ROCKSTEP MERIDIAN, that CONSULTANT had given the CENTER owners bad business advice regarding layout of the CENTER, had misled MERIDIAN BEVCO and ROCKSTEP MERIDIAN in the buildout and operation of the CENTER business, that CENTER arcade games and activities installed by HYPE! ADVENTURES in the CENTER was not a game arcade and whatever games are located there were a business mistake, and that CONSULTANT'S employees CHARLES and JACKSON were not competent in the family entertainment center business or the Virtual Reality VR business to plan, install, operate or advise the CENTER owners on the Virtual Reality VR Games which were installed within the CENTER by CONSULTANT and CHARLES and JACKSON, that CHARLES and JACKSON chose to utilize shoddy, cheap, less than state of the art VR equipment then available for the CENTER'S intended use with no reasonable analysis done by CONSULTANT, CHARLES or JACKSON as to the cost to value relationship of the equipment compared to the needs of the CENTER. GREGG BORMAN, SR. further inferred that CHARLES and JACKSON were incompetent to properly perform such services for MERIDIAN BEVCO and ROCKSTEP MERIDIAN and that such equipment is inferior or unsuited for its intended purpose, business plan and cost budget. All these allegations are false and morally corrupt.

91.  After preserving his unconscionable and malicious defamatory and false social media publications and postings on www.Facebook.com for 30 days, until he and DEFENDANTS apparently had serious fears that these publications might subject him and his employer DEFENDANTS to substantial claims for compensatory and punitive damages by PLAINTIFFS, then GREGG BORMAN, SR. and DEFENDANTS in August 2021, about thirty days or so after publication and posting these defamatory false statements on the World-Wide Web, tried to cover and eliminate his illegal, unconscionable tracks and actions, so he elected to delete all such publications and to hide evidence of his unconscionable actions, while leaving published all his other vast publications for many years regarding the Family Entertainment Industry, but not referring to PLAINTIFFS. However, unfortunately for him and his DEFENDANT conspirators, it was then too late thirty days after the publications, to mitigate the material damages to PLAINTIFFS created by his false publications. After his malicious and false conduct and his subsequent deletions and attempts at hiding, he then continued his employment and agency with DEFENDANTS even to today, to post on these same www.Facebook.com accounts to identify the "Hype" branded and licensed location of CONSULTANT in Meridian, MS, indicating his employer DEFENDANTS as licensee of the Hype brand, and their need for his expert help to "fix" the problems with the CENTER created by CONSULTANT, DENA, CHARLES and JACKSON, which continues to identify CONSULTANT'S Licensee location and continues to defame, damage and essentially destroy PLAINTIFFS' character, good names, reputation and business in spite of his previously deleted false, damaging statements.

92.  Attached as "Exhibit K" are the copies of the publication and statements GREGG BORMAN, SR. made against CONSULTANT, DENA, CHARLES AND JACKSON and then intentionally deleted from his website accounts in order to hide their defamatory conduct further. The evidence will show that GREGG A. BORMAN, SR. had no knowledge of what, why or how

CONSULTANT, DENA or CHARLES and JACKSON had performed their services or chosen such equipment for use, or how any such equipment performed or should be managed in the CENTER.

93. GREGG BORMAN, SR. and DEFENDANTS, continued to post and publish on Facebook FEC Operators group page of the now 2,600 family entertainment center industry professionals, (such posts attached hereto as "EXHIBIT N") regarding PLAINTIFFS and the CENTER even up to recently as November 30 , 2021, disputing the multiple derogatory and possibly defaming statements of ANDY WEINER to CONSULTANT and likely to other third parties, regarding the condition and performance of the CENTER prior to PLAINTIFFS' leaving the CENTER management on January 31, 2021. GREGG BORMAN, SR. published and stated that the CENTER "opened in September (2020) and had fantastic numbers all through January of this year (2021)." Rather than blaming the collapse in CENTER Sales and operations after PLAINTIFFS left management on January 31, 2021, on PLAINTIFFS prior actions, GREGG BORMAN, SR. continued posting stating that the reason for the falloff in results was due to "a small fight between two rival gangs that was put on Facebook and the local media. Immediately the birthday and transient business took a dump and has struggled to regain traction. The locals think it is unsafe even though it is in a mall and has security."

94. GREGG BORMAN, Sr. continued in his posting to contend that he, as a California native, is an "expert" on racial problems and relationships in the "American South" and that the blame for the collapse in CENTER performance was due to continuing material racial unrest and discrimination by white people against African-American people in Meridian, MS, stating "It doesn't help that it is in the south and whether you admit it or not race unfortunately still plays in the decisions of people." In fact, the facts and evidence in this action will show there was no fight or any problems between any two "gangs" in the CENTER and there were no such problems while PLAINTIFFS managed the CENTER. PLAINTIFFS have not been apprised of any racial problems regarding our HYPE! ADVENTURES brand in the CENTER, and PLAINTIFFS know of no racial problems in the community ever involving the CENTER. The Sales and management problems arose for the CENTER when DEFENDANTS adopted the NEW ROCKSTEP BUSINESSS PLAN and hired MATTHEW JEFFERY and his band of incompetent family member managers as the NEW ROCKSTEP MANAGEMENT TEAM to manage the CENTER, then hired GREGG BORMAN, SR. to replace failed MATTHEW JEFFERY and attempt to "fix" things again, but the CENTER has "struggled to regain traction" for those reasons only.

95. GREGG BORMAN, SR. and DEFENDANTS, continued thereafter on December 3, 2021, to defame PLAINTIFFS business and management ability and post and publish on Facebook FEC Operators group page of the now 2,600 family entertainment center industry professionals regarding PLAINTIFFS and the CENTER bragging on himself for the second time and claiming that he had a safety expert named "Bob Ito" check out the Hype Adventure CENTER for safety issues, when in fact the inspection of the CENTER by Bob Ito had been discussed, recommended and planned by the CENTER'S own liability insurance

broker, Richard Maylott, many months prior to any involvement by GREGG BORMAN, SR. in the CENTER.

96. On December 12, 2021 GREGG Borman, Sr. went on posting and criticizing CONSULTANT'S selection of "CLUBSPEED brand POS" software system to manage the CENTER operations and that he "fixed" and replaced the software and hardware of such system in the CENTER, in spite of other industry operator posters on the Group Page discussion noting that the CLUBSPEED POS system was one of the "better" go-karting, food and beverage, kitchen and arcade systems in the industry and was capable of being expanded to easily add arcade debit card usage availability for customers and a kitchen module for expanded food menus, because GREGG BORMAN, SR. said he preferred one "fully integrated system" rather than a system utilizing third party add-on software modules to an existing "CLUBSPEED" software system. GREGG BORMAN, SR. stated he pulled and removed the CLUBSPEED system from the CENTER because the fees and time required to add the modules and manage the multiple modules he wanted to use "isn't worth it to him." He further stated that the "CLUBSPEED" café software was "not close to bigtime "café management software, when in fact the evidence will show that the CENTER food menu instituted by PLAINTIFFS as well as the changed new menu currently instituted by the NEW ROCKSTEP MANAGEMENT TEAM is a very basic, simple, pre-cooked food menu typical of family entertainment center menus across the nation, not requiring any "bigtime" software typically used in more complicated full service kitchen and dining establishments, and that in fact the "CLUBSPEED" POS software and hardware can be upgraded if park owner decides that a typical, simple, family entertainment center café needs to become complicated to operate and "bigtime" in any way, while typically most family entertainment center cafes are not at all complicated or in any way "bigtime" food menus or operations. The facts will show that GREGG BORMAN, SR.'S new hardware and software system is more expensive to operate, costs more to purchase and set up hardware and software, does not save any material employee time to operate and does not accomplish anything materially more or better than the existing "CLUBSPEED" system in the CENTER was capable of managing successfully and more inexpensively. CLUBSPEED POS was certainly not a poor choice of POS systems for the CENTER by CONSULTANT in their providing their services to DEFENDANTS. The facts will show that these FEC Facebook Group WORLD-WIDE WEB publications to thousands of industry professionals, were simply additional and continuing attempts to boost GREGG BORMAN, SR.'S and DEFENDANTS own business character, image and reputation to his fellow DEFENDANTS, their business associates and other industry professionals, while continuing to defame and falsely conspire with other DEFENDANTS against CONSULTANT'S reputation and character, and to blame CONSULTANT for GREGG BORMAN, SR. and other DEFENDANTS continuing failing in the operation and business plan of the CENTER due to their multiple erroneous changes in operations.

97. GREGG BORMAN, SR. continues posting and placing in a false light and defaming PLAINTIFFS on December 17, 2021, bragging that he would need to return to Hype! Adventures in Meridian in late January for a "VIP Event" to show off all his "fixing" and

changing of the "problems" with the CENTER caused by PLAINTIFFS that he had to correct to "show the investors the changes" he had made to the CENTER. The facts will show that it is unclear what "fixes" GREGG BORMAN, SR. will be able to show to investors for his "changes."

98. All of these GREGG BORMAN, SR. statements made to enrich himself and the other DEFENDANTS and are outrageously negligent, wasteful, reckless, intentional, vile, false and defamatory and are beyond the boundaries of acceptable conduct in any civil society, place CONSULTANT, DENA, CHARLES and JACKSON in an incredibly false light to the general public, to CONSULTANT'S, DENA, CHARLIE AND JACKSON'S customers and to CONSULTANT'S, DENA, CHARLIE and JACK'S 2,600 member family entertainment center business industry, were published to billions of other third parties and WORLD-WIDE WEB users and were clearly undertaken in a state of mind which evidences hatred, ill will, or a spirit of revenge which should be punished by this Court.

99. Through a pattern of tortious conduct and conspiracy among themselves to damage and essentially destroy CONSULTANT'S, DENA, CHARLIE and JACKSON'S , and TY'S character, good names, reputation and business and cause them personal injury and by breaching their written and oral contractual agreements with CONSULTANT, the DEFENDANTS carried out a plan to (1) not pay their just debts to PLAINTIFFS, (2) put any blame for their own failed business decisions and results onto CONSULTANT, DENA, CHARLES, JACKSON and TY and (3) minimize and essentially destroy CONSULTANT, DENA, CHARLIE, JACKSON and TY as potential competitors of DEFENDANTS in the family entertainment center industry community while enriching and bettering themselves both financially and professionally. The DEFENDANTS attempted to avoid their own liability, accountability and responsibility to their affiliated employees, affiliated companies and their associates, their affiliated company investors and their commercial bank lenders, for the drastic negative financial and operational performance and Sales collapse of the CENTER, resulting from their erroneous and material business plan changes and incompetent daily management, beginning soon after the implementation of these changes to the operation and business plan of the CENTER, by falsely claiming that the CENTER was, before DEFENDANT'S material changes, about to suffer dramatic declines and loss of Sales, financial and operational and safety performance because of the previous HYPE! ADVENTURES BUSINESS PLAN and management of the CENTER by CONSULTANT, DENA and employee TY, which was by any reasonable measure in fact very successful and not deteriorating up until it ended on February 1, 2021 and was in fact "fantastic numbers" as correctly described by DEFENDANT'S own GREGG BORMAN, SR. in November 2021.

100. There is no factual basis to support those defamatory allegations by DEFENDANTS, as the CENTER operation was exceeding all financial, operating and safety incident projections previously agreed to by the Parties prior to DEFENDANT'S changes to the NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM, especially when reviewing the overall CENTER performance during the last 90 days that CONSULTANT was acting as sole General Manager of the CENTER without the incompetent prior management of CENTER General

Managers by Tommy Stewart and ANDY WEINER, after DEFENDANTS had suffered operationally in their sole management of the first two CENTER general managers in September and October 2020.  There were no material financial performance, operational or customer safety issues existing when CONSULTANT ceased providing their services, other than daily and monthly maintenance and repair issues that arise normally in operations of this type of business.  DEFENDANTS own general liability insurance broker had commented several times prior to February 1, 2021, that the customer safety record of the CENTER during the pre-opening months and first 5 months of CENTER operation was unusually good regarding financial performance and operations safety, with few customer or employee incidents regarding safety or injury.

101. PLAINTIFFS will show that the following extensive number of Counts of multiple individual Torts, Conspiracies and Breach of Contracts resulting from the misdeeds, nonfeasance, misfeasance and malfeasance of DEFENDANTS and their agents, was caused by DEFENDANTS, individually and as agents, willful, malicious or reckless actions in misjudging the financial and operational viability of their NEW ROCKSTEP BUSINESS PLAN and their NEW MANAGEMENT TEAM'S inexperience and inability to manage the CENTER.  In order to attempt to avoid DEFENDANT'S fault, responsibility and accountability to their affiliated companies, their company's investors, associates and commercial debt banker lenders for their poor management and operational results of the CENTER after February 1, 2021, DEFENDANTS attempt to place the blame and fault for their failures on PLAINTIFFS and attempt to avoid payment of amounts justly due to CONSULTANT.  CONSULTANT will show that the HYPE! BUSINESS PLAN and then existing management team worked successfully in the CENTER up to February 1, 2021 and until terminated, and that CONSULTANT'S other similar and comparable family entertainment center located in Dothan, AL, has performed increasingly well in all aspects of operations and safety and financial performance with this same CONSULTANT business plan for over three years since opening in 2018, as was originally represented to DEFENDANTS starting in 2019.  DEFENDANT'S failures with the CENTER are due solely to their own weak, negligent, incompetent, inexperienced and reckless actions before and after CONSULTANT left the CENTER premises on January 31, 2021.

102. DEFENDANTS' Plan to avoid responsibility and accountability for their failed actions while damaging PLAINTIFF'S character, reputation and business has now backfired on DEFENDANTS, as the CENTER is now failing to meet any of the operational, safety or financial goals established for the CENTER since DEFENDANT'S changes beginning February 1, 2021 and has now reached a point where it is doubtful to any reasonable person that the CENTER can continue as a viable going concern by utilizing DEFENDANT'S NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM.

103. CONSULTANT'S existing business plan was exceeding all CENTER operating performance budgets for Sales, free cash flow/ EBITDA/ Net Monthly Earnings, safety and successful operations established and agreed by the Parties prior to CENTER opening and before

DEFENDANT'S made their material CENTER business plan and management changes beginning on February 1, 2021.

104. There is no dispute by PLAINTIFFS that in DEFENDANT'S sole discretion, DEFENDANTS had the contractual right in the AGREEMENT and in the TRADE-NAME LICENSE AGREEMENT, to freely and materially change the CONSULTANT'S Business Plan in the CENTER and to change the CONSULTANT'S well trained management team in the CENTER, without requiring CONSULTANT'S training of the NEW MANAGEMENT TEAM. CONSULTANT'S repeated protests to DEFENDANTS, opposing the proposed new business plan changes and protesting the lack of experience and qualifications of MATTHEW JEFFERY and the NEW MANAGEMENT TEAM had no legal effect or created no obligations between the Parties under the two Agreements and were rightfully completely ignored by DEFENDANTS. All of these actions were within DEFENDANT'S right under the two agreements with CONSULTANT.

105. However, DEFENDANTS do not have the right, nor are they entitled, to defame, cast PLAINTIFFS to the public in a false light, defraud and conspire to create a tortious plan among themselves to carry out these multiple tortious acts against PLAINTIFFS, to damage and essentially destroy PLAINTIFF'S character, good names, reputation, business, brand and valuable tradename, and cause emotional distress, as well as deny the right to payment for their valuable services to DEFENDANTS.

106. The evidence will show that DEFENDANTS took these actions in order to deflect attention from DEFENDANTS flawed, incompetent and failing business plan and operational decisions and actions regarding the CENTER and to blame PLAINTIFFS for the failing results of DEFENDANT'S material business changes to the CENTER after PLAINTIFFS left the CENTER general management. These actions were undertaken after January 7, 2021, when MATHEW JEFFERY visited the CENTER, and after the subsequent hiring of MATTHEW JEFFERY, when DEFENDANTS realized that their conspiracy and plan to defame and blame PLAINTIFFS for their material changes to the CENTER beginning February 1, 2021, was required by them in order not only to eliminate PLAINTIFFS as a future competitor in the Family Entertainment Center industry but to remove all risks of blame and fault from DEFENDANTS for any failing CENTER operational and financial results that might occur after February 1, 2021, should DEFENDANTS not be as smart as they thought they were, and to place the blame and fault solely on PLAINTIFFS.

107. DEFENDANTS have in fact taken a very successful "HYPE! ADVENTURES" family entertainment CENTER business on February 1, 2021, that could have succeeded for many years later if managed properly, and turned it into a very unsuccessful family entertainment center business, both operationally and financially. At the time DEFENDANTS realized their mistakes, they were also having to communicate and explain to their company's shareholders and members, disgruntled employees and associates, disgruntled customers and unhappy commercial bank lenders, as to what had happened to the CENTER in such a short period of time and why the CENTER operations and financial performance had quickly gone from a clear business success over the first 8 months of

operations, exceeding expectations, to collapsing over the past 7 months of operations up to this date.

108. The evidence will show that the CENTER operating performance began manifesting overall sales declines by February 28, 2021 after most of the material business changes by DEFENDANTS had been made and almost 30 days following PLAINTIFF'S departure from the CENTER.  By March 31, 2021, after all business changes by DEFENDANTS had been completed, the CENTER suffered further overall deterioration in operating and financial performance. Virtually every month thereafter to present, the CENTER performance declined to where it is now questionable whether the CENTER can continue as a going concern under generally accepted accounting principles.  These declines were due to the new flawed business plan, a failed new management team, loss of previously earned customer goodwill, and public community, customer and employee apathy and unhappiness toward the business changes made by DEFENDANTS to the CENTER.

109. PLAINTIFFS further allege that due to the multiple number of incidents of defamation and conspiracy set out in these Counts below, as well as DEFENDANTS efforts already undertaken to destroy written evidence of their unconscionable actions, and the large number of DEFENDANTS' affiliated companies, employees, shareholders, members, investors and commercial bank lenders likely to have knowledge of these unconscionable actions and be a possible party to these actions, that subsequent extensive discovery in this Action will identify many further acts of conspiracy to defame, and placing PLAINTIFFS publicly in a false light, which are not already alleged against ANDY WEINER and other DEFENDANTS herein.  PLAINTIFFS reserve the right to amend this COMPLAINT to add these anticipated further unconscionable and tortious actions likely committed by ANDY WEINER and other DEFENDANTS as additional Counts in this Action, which are likely due to ANDY WEINER and other DEFENDANTS' urgent desire to destroy and hide their own actions and escape blame, fault and responsibility for their multiple misdeeds, nonfeasance, malfeasance and misfeasance managing the CENTER while attempting to eliminate PLAINTIFFS as a competitor in the family entertainment center industry.

110. The facts will further show that ANDY WEINER, the President, Chief Executive Officer and head ringleader of DEFENDANT'S conspiracy, as well as the other DEFENDANTS, are not the highly moral individuals or companies who they appear to be.  They manufactured a false overall business conduct policy for their ROCKSTEP companies against CONSULTANT, their own CENTER employees, and associated third parties. DEFENDANTS conducted a consistent pattern of deceit regarding their true business attitude and nature, constantly, falsely and hypocritically claiming to do business with CONSULTANT and the general public considerately, honestly, fairly and in good faith, by always following their proprietary "25 Rockstep Ways" published for years by DEFENDANTS touting themselves as honest and virtuous to the general public.  They did this in order to constantly teach everyone else who they generally consider inferior to them, the correct way to conduct proper moral business. DEFENDANTS make clear to all business acquaintances that everyone should adopt their "25 Rockstep Ways."  DEFENDANTS true business conduct is clearly just the opposite of their "25 Rockstep Ways" set out in "Exhibit L" attached, which DEFENDANTS hypocritically preach to others on a constant basis.

111. The evidence will show that DEFENDANT'S repeated unconscionable, vile and deceitful conduct over a 9-month period alleged in this COMPLAINT failed to comply with 72%, at least 18, of DEFENDANT'S own "25 Rockstep Ways" set out below in its dealings with PLAINTIFFS and the CENTER:

    1.  DO THE RIGHT THING, ALWAYS.
    2.  PRACTICE A+NESS.
    3.  PRACTICE BLAMELESS PROBLEM SOLVING.
    4.  BE PREPARED.
    5.  LISTEN GENEROUSLY.
    6.  SPEAK STRAIGHT.
    7.  HONOR COMMITMENTS.
    8.  BE RELENTLESS ABOUT IMPROVEMENT.
    9.  BE EASY TO WORK WITH.
    10. BE TRANSPARENT.
    11. INVEST IN RELATIONSHIPS.
    12. PROVIDE SOLUTIONS.
    13. SHOW MEANINGFUL APPRECIATION.
    14. BE A BRAND AMBASSADOR.
    15. BE POSITIVE.
    16. DON'T BE A JERK.
    17. BE A CAREFUL STEWARD OF OUR ASSETS.
    18. KEEP THINGS FUN.

112. DEFENDANTS pattern of false and defamatory business conduct, committed on a regular basis over many months against the PLAINTIFFS, is quite different from their "25 Rockstep Ways" and such hypocrisy and deceit in their attitude and actions against CONSULTANT practically destroying PLAINTIFF'S family entertainment center business and promotional businesses, and demands not only substantial compensatory damages to PLAINTIFFS, but severe punishment damages against ANDY WEINER, the head ringleader and planner of this company-wide unlawful conduct conspiracy, as well as the other conspirator DEFENDANTS, individually and as agents of the ROCKSTEP affiliated Companies, by this Court granting substantial punitive damages against DEFENDANTS to halt their continuation of this unconscionable conduct in the future.

113. DEFENDANTS also falsely withheld required CENTER financial information reports and earned payments of contractual amounts for fixed and variable consulting fees and expenses due CONSULTANT for consulting services and general management services in the CENTER, without justification, under the terms of the TRADE-NAME LICENSE AGREEMENT and the AGREEMENT and other oral binding promises by DEFENDANTS relied on to their detriment by CONSULTANT.

114. PLAINTIFFS do not dispute that DEFENDANTS have the limited right to use the "Hype! Adventures" brand under the existing TRADE-NAME LICENSE AGREEMENT unless and until they breach such contract.  DEFENDANTS further have the right to oversee,

manage, market, advertise and operate their CENTER as ignorantly, incompetently and poorly as they wish, and also to engage in such unreasonable, foolish and wasteful behavior as they desire; however, DEFENDANTS cannot hold or prove CONSULTANT responsible for the subsequent failed CENTER'S financial, operational and safety performance occurring after DEFENDANTS' implementation of their materially changed NEW ROCKSTEP BUSINESS PLAN and failed NEW MANAGEMENT TEAM.  Nor can they use their failed business results as an excuse to defend and continue their egregious tortious actions and breach of contract actions in failing to comply with the TRADE-NAME LICENSE AGREEMENT and the AGREEMENT.  Nor can DEFENDANTS rightfully destroy the PLAINTIFF'S businesses, good names, characters, and reputations to billions of other people on the WORLD-WIDE WEB, their family entertainment center industry associates and potential customers, making it virtually impossible for PLAINTIFFS to to move forward in the future with their Hype! Adventures consulting, licensing or franchising business, or the Cool Cats Computer consulting business owned by CHARLES and JACK.  DEFENDANTS have put PLAINTIFFS practically out of business through their destructive conduct.  The evidence will show that this failing CENTER'S performance was caused by DEFENDANTS immediately terminating CONSULTANT'S existing HYPE! BUSINESS PLAN and terminating the majority of CONSULTANT'S existing CENTER fully trained management team, while substituting inexperienced, incompetent and untrained managers, with few exceptions, to their NEW MANAGEMENT TEAM, and adopting, in a smaller, secondary business market, the unsuitable and improper urban market business plan, namely the NEW ROCKSTEP BUSINESS PLAN, in their place, while at the same time falsely trying to blame PLAINTIFFS for their own actions and results in order to achieve DEFENDANTS illicit ends and aims.

115. The attached Chart named "Exhibit M", details the numbered material elements of the HYPE! BUSINESS PLAN which was terminated by DEFENDANTS during February and March 2021, when they adopted the NEW ROCKSTEP BUSINESS PLAN, as well as the corresponding numbered elements of the NEW ROCKSTEP BUSINESS PLAN adopted in place of the HYPE! BUSINESS PLAN.  The two Plans are compared in the Chart.  The HYPE! BUSINESS PLAN attracted all age groups, including the 2-11 children group, the 12-17 pre-teen/teenager group, the 18-24 young adult group and the 25-80 adult group.  The ROCKSTEP BUSINESS PLAN attracts predominantly the 2-11 age group and their chaperones which is not a large enough base in Lauderdale County, MS to successfully support the NEW ROCKSTEP BUSINESS PLAN. The evidence and testimony will show that the two opposing business plans are so fundamentally different that the NEW ROCKSTEP BUSINESS PLAN was adamantly and loudly rejected by CONSULTANT to the DEFENDANTS for use in the CENTER and such Plan was later rejected by most of the original existing CENTER customer base, whose retention as customers was necessary for the CENTER business success.  It would be impossible to place any fault

on PLAINTIFF'S for the HYPE! BUSINESS PLAN now failing CENTER operational and financial results after adoption of the much different NEW ROCKSTEP BUSINESS PLAN.

116. The blame and fault in this Action for the now financially and operationally failing CENTER does not lie with PLAINTIFFS, but began when DEFENDANTS implemented their numerous changes. It arises solely from DEFENDANT'S implementation of this failed NEW ROCKSTEP BUSINESS PLAN, the failed NEW MANAGEMENT TEAM and their tortious conspiracy to eliminate PLAINTIFFS as a competitor while falsely blaming PLAINTIFFS for their own business failures in order to shield their own responsibility from all their interested third parties and to achieve their business and financial ends and aims.

117. The below list details the management staff changes made by DEFENDANTS during February, March, April and May 2021, which replaced experienced, trained and knowledgeable family entertainment center employees in favor of the NEW ROCKSTEP MANAGEMENT TEAM, consisting of mostly family members or existing employees of MATTHEW JEFFERY within his Vendors Village art and crafts antique mall rental kiosk business, which the facts and testimony will show were mostly inexperienced, unknowledgeable, untrained and/or unsuited to manage the CENTER, resulting in failing CENTER operational and financial results after February 1, 2021, which cannot be blamed on PLAINTIFFS or the HYPE! BUSINESS PLAN.

    1)     CONSULTANT was terminated as General Manager in favor of MATTHEW JEFFERY and his team of multiple family members and previously existing business associates, who had virtually no experience or training in managing a family entertainment center.

    2)     Tyeasha Bell Lindsey, Events and Party Manager since opening, was released when her manager position was eliminated due to DEFENDANTS desire to reduce and simplify Event and Party Sales in the CENTER. No replacement was promoted or hired.

    3)     General Manager-in-training, left employment due to disagreement with the NEW MANAGEMENT TEAM policies.

    4)     Assistant Operations Manager since opening, left employment due to disagreement with the NEW MANAGEMENT TEAM policies.

    5)     2nd Assistant Operations Manager since opening, left employment due to disagreement with the NEW MANAGEMENT TEAM policies.

    6)     Racetrack Go-kart Manager since opening, left employment due to disagreement with the NEW MANAGEMENT TEAM policies.

    7)     Maintenance Manager since opening, left employment due to disagreement with the NEW MANAGEMENT TEAM.

    8)     Lead Party Host, left employment due to disagreements with the NEW MANAGEMENT TEAM policies.

    9)     Assistant Party Manager, left employment due to disagreements with the NEW MANAGEMENT TEAM policies.

10)    1st Party Host, left employment due to disagreement with the NEW MANAGEMENT TEAM policies.

11)    2nd Party Host, left employment due to disagreement with the NEW MANAGEMENT TEAM policies.

118. ANDY WEINER stated to CONSULTANT on May 13, 2021, that the Sales success of the CENTER while CONSULTANT managed it was what he considered to be "synthetic revenue", due solely to the initial opening period of the CENTER and that the CENTER could not continue Sales at such a high rate as the first 7 months Sales without implementing his desired NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM changes. Below is a list of CENTER historical and projected Sales monthly from opening in the middle of September 2020 to termination of CONSULTANT as General Manager on January 31, 2021, then below that shows the Sales for the two months during the transition period after adoption of the NEW ROCKSTEP BUSINESS PLAN and the NEW MANAGEMENT TEAM ending March 31, 2021, and below that shows the Sales after the transition period was over, up to current date.  These Sales clearly indicate that the CENTER Sales were not "synthetic" except perhaps a small portion of the Sales during September and October 2020, which were the first 6 weeks of the opening of the CENTER and were certainly not "synthetic" by the third and fourth months of operation in November and December 2020.

119. The evidence will show that CONSULTANT'S existing similar center in Dothan, Al never had any initial opening period showing any type of "synthetic" Sales and further that retail businesses in general do not see any "synthetic" Sales past about 60 days after opening in any retail store.  One of the reasons Sales in the CENTER were not "synthetic" in the first 60 days is because there were not many Event and Party Bookings actually occurring in the first and second month after CENTER opening, because such events must be planned well in advance by customers and employees after CENTER opening because of planning and logistical issues and the CENTER was never able to project any opening date to the public prior to a day before actual opening.  These events could not begin to be planned, booked and held until the day before opening was selected.  In addition, the Covid-19 pandemic made it virtually impossible to book any school or group event during this same time up until year end.  Most such bookings began consistently in the second month of operations during October 2020.  Events and Parties can and were expected to constitute up to 25% of all Sales in a family entertainment center like the CENTER.  Therefore, the allegations of "synthetic revenue" after October 2021, are false and unfounded.

120. DEFENDANTS had a CENTER operation performing extraordinarily well in all aspects by January 31, 2021, and DEFENDANTS cannot place blame and fault for their subsequent business plan and management failures on the CONSULTANT'S HYPE! BUSINESS PLAN or on the original CENTER management team led by CONSULTANT and TY in employment at the CENTER on January 31, 2021.  Monthly CENTER Sales are set out below:

**1. Sales during CONSULTANT Management Period:**

Partial September 2020 -  $144,000

October 2020 -  $234,000

November 2020 -  $177,000

December 2020 -  $170,000

January 2021 -  $273,000

**2. Sales during NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM Transition Period:**

February 2021 -  $178,000

March 2021 -  $265,000

Sales after NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM in place:

April 2021 -  $180,000

May 2021 -  $147,000

June 2021 -  $156,000

July 2021 -  $158,000

August 2021 -  $75,000

September 2021  $78,000

October 2021  $82,000

November 2021  $93,000

121. Clearly, historical Sales trends after the final implementation of the NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM of DEFENDANTS by March 31, 2021, would lead any reasonable person to conclude that Sales have been rapidly declining after the Sales performance under the PLAINTIFF'S business plan and management, especially during the spring and summer months of 2021, which typically should be the best Sales months annually. These results cannot be blamed on the HYPE! BUSINESS PLAN or the original CENTER management team including CONSULTANT and TY, which were both terminated by February 4, 2021.

122. DEFENDANTS can certainly cannot blame PLAINTIFFS for their offensive, ill-willed, defaming, false light, and conspiratorial conduct and acts, nor their failure to pay their just debts to CONSULTANT. All of this is in direct violation of their own affiliated, company-wide, self-professed, life-conduct code, called the 25 "ROCKSTEP WAYS" created personally by the ringleader of this tortious conduct, ANDY WEINER, which clearly appears to be a very hypocritical and deceitful mantra for DEFENDANTS actual business conduct. DEFENDANTS constantly tout, remind and swear by this conduct mantra to themselves and to third parties, but in fact seldom follow it and rather use it as a hammer to slam, demean and criticize the conduct of others doing business with them. This hypocritical, false code of conduct which DEFENDANTS constantly profess, further shows that the DEFENDANTS are not to be trusted in their words or their deeds and in fact they engage in atrocious, revolting, cynical, ill-willed, and revengeful conduct to meet their ends and aims, which begs to be and should be punished severely by this Court with an award of substantial

35

punitive damages, in addition to the compensatory damages, injunctions and other relief demanded to be awarded to PLAINTIFFS herein.

## COUNT 1

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

123. PLAINTIFFS restate and reaver each and every allegation contained in the preceding or subsequent paragraphs of this COMPLAINT as if fully set forth herein.

124. PLAINTIFFS believe, and on such information and belief allege, that each of the aforementioned DEFENDANTS published wantonly, willfully or recklessly, maliciously, and intentionally inflicted false statements about PLAINTIFFS to third parties causing emotional distress, sleeplessness and depression for Plaintiffs, evoking outrage and revulsion upon PLAINTIFFS without just cause, with intent of harming PLAINTIFFS and as a direct and proximate cause of the actions of DEFENDANTS and their agents, PLAINTIFFS were irreparably harmed by the false, misleading, defamatory and false light statements of DEFENDANTS and their agents alleged in this COMPLAINT.  The making of such false, misleading, defamatory and false light statements by DEFENDANTS, was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  PLAINTIFFS and their employees who acted for CONSULTANT, suffered and continue to suffer mental anguish, sleeplessness and depression as a result of being defamed, slandered, libeled and being placed in the public eye in a false light by DEFENDANTS, and said mental anguish, sleeplessness, and depression is of a nature that no reasonable person could be expected to endure.

125. DEFENDANTS' statements now make it difficult to market PLAINTIFF'S business services to the family entertainment center industry as well as to the general business community without great effort by PLAINTIFFS to neutralize these damaging statements which are false, misleading, defamatory and place PLAINTIFFS in a false light because PLAINTIFFS falsely, maliciously or recklessly left a highly unfavorable impression of PLAINTIFFS' respective characters, reputations and businesses.

126. DEFENDANTS' statements are words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of PLAINTIFF'S profession, trade and business as well as words imputing onto CONSULTANT the guilt or commission of multiple acts of the criminal and civil offense of Fraud involving moral turpitude and infamous punishment.

127. DEFENDANTS' statements from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace against PLAINTIFFS undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge.

128. Since their actions, these statements have remained uncorrected and PLAINTIFFS have no means of correcting these statements or correcting their impact on the family entertainment center industry or the general business community.

129. PLAINTIFFS have suffered from mental anguish, lost sleep, depression, stress induced declining health, have felt insulted, demoralized and demeaned and all PLAINTIFF'S reputations were besmirched to the public.

130. As a direct and proximate result of DEFENDANTS' intentional and malicious, false and defamatory statements, PLAINTIFFS have been and will continue to be damaged and injured.

131. PLAINTIFFS pray that this Court will award damages against DEFENDANTS for this intentional infliction of emotional distress on the PLAINTIFFS because of these illegal publications.

## COUNT 2

### DEFAMATION PER SE BY SLANDER PER SE BY DEFENDANT MATTHEW JEFFERY

132. PLAINTIFFS restate and reaver each and every allegation contained in the preceding or subsequent paragraphs of this COMPLAINT as if fully set forth herein.

133. On or about January 5, 2021, DEFENDANT MATTHEW JEFFERY, Individually, spent three days in the CENTER reviewing the operations and asking questions of CENTER employees and CONSULTANT employee Joe Malugen, who was there continuing to act in CONSULTANT'S capacity of acting General Manager of the CENTER.  All questions of MATTHEW JEFFERY were answered by the management team and MATTHEW JEFFERY did not indicate in any of those conversations any material issues with the operation of the CENTER.

134. On or about January 21, 2021, DEFENDANT ANDY WEINER and Tommy Stewart and Tim Koltermann, all employees of ROCKSTEP CAPITAL 1, ROCKSTEP CAPITAL 2, ROCKSTEP MERIDIAN and/or MERIDIAN BEVCO, contacted CONSULTANT by telephone.  DENA and Joe Malugen, employees of CONSULTANT were on the call.  ANDY WEINER stated that he had serious concerns about the safety of the CENTER regarding the equipment for customer use due to comments from MATTHEW JEFFERY after his trip to the CENTER to review operations.

135. Joe Malugen then stated that MATTHEW JEFFERY had not indicated any safety issues to him when talking to MATTHEW JEFFERY at the CENTER, nor was he aware of any material safety problems other than those known general issues with operating any family entertainment center offering physical games and activities, as there are always inherent recognized dangers with attempting any athletic activity, along with normal wear and tear on equipment requiring daily and weekly assessment and repair when experiencing high customer traffic on such equipment.

136. The safety record of the CENTER had previously been discussed with this group and it had been noted to them several times previously, that only 3 incidents regarding customer safety, with only 1 of the 3 being serious, had occurred in the previous 6 months, from the time the equipment was installed and being used by employees or customers in August 2020 to late January 2021. Moreover, it had also been discussed that the CENTER general liability insurance broker had noted several times that he was surprised at the low number

of incidents that had occurred during that time, in spite of the high CENTER Sales and customer traffic exceeding agreed projected sales and traffic for the CENTER.

137. Joe Malugen asked these DEFENDANTS on the call for a list of the issues observed by MATTHEW JEFFERY on his visit to the CENTER, so CONSULTANT could address them.  No such information has ever been provided to CONSULTANT.

138. MATTHEW JEFFERY, who was not an agent of DEFENDANTS at that time, subsequent to his trip to the CENTER January 5, 2021, libeled and slandered CONSULTANT by stating to the other DEFENDANTS and to other third parties, that the equipment in the CENTER, designed, purchased, installed, managed and maintained during CONSULTANT'S term as a either consultant or general manager of the CENTER, was unsafe for use for its intended purpose by any person, when in fact such equipment had performed very well and was managed and maintained very well for the 6 months of its lifespan in the CENTER when used as a part of the HYPE!  BUSINESS PLAN and managed by the then existing CENTER management team.  The evidence will show that any physical activity or game is inherently dangerous to users and injury can occur regardless of all due care, especially if the CENTER is not managed well and maintained by a competent management team, if equipment is not supervised properly for customer use, and if employees are not trained by management to use and monitor such equipment.

139. The facts will show that MATTHEW JEFFERY did in fact, after assuming the responsibility for the CENTER as General Manager, and after first terminating the HYPE! ADVENTURES BUSINESS PLAN and the existing management team in favor of the NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM, had such a startlingly high number of customer safety incidents and injuries in his first 3 months of management, that DEFENDANT'S general liability insurance policy was cancelled by then existing insurance carrier due to these incidents occurring after February 1, 2021 and the carrier's loss of confidence in MATTHEW JEFFERY and DEFENDANT'S management abilities.  A new, much more expensive general liability policy with another substitute carrier was required to be written soon thereafter due to this large number of incidents and injuries, almost an eight-fold increase in incidents in the first 3 months after MATTHEW JEFFERY assumed control of the CENTER over the incidents in the first 6 months of CENTER operation.  The evidence will show that this rash of incidents was due to MATTHEW JEFFERY'S failure to manage and supervise the CENTER properly and his lack of knowledge, experience or ability to manage and supervise such a business operation and also due to all the DEFENDANTS' reckless, negligence, malfeasance and misfeasance in placing inexperienced and untrained MATTHEW JEFFERY in operational control of the CENTER, when adopting the NEW ROCKSTEP BUSINESS PLAN and the NEW ROCKSTEP MANAGEMENT TEAM.  These incidents were not due to unusual safety issues with the equipment, as few such issues occurred during CONSULTANT'S managing of the CENTER for the 6-month prior period, when the CENTER had almost 100% more customer traffic and customer use of the same equipment than it did during MATTHEW JEFFERY'S control of the CENTER up to that date.

140. These MATTHEW JEFFERY false statements to other DEFENDANTS and other third parties to be identified in discovery, now make it difficult to market PLAINTIFF'S services to the

family entertainment center industry without great effort by PLAINTIFFS to neutralize these damaging statements, because PLAINTIFFS have been falsely and maliciously or recklessly slandered as not being capable of safely designing, installing or managing a CENTER such as this, leaving a highly unfavorable impression of PLAINTIFFS reputation and business.

141. DEFENDANTS' statements to these third parties are DEFAMATION Per Se by SLANDER Per Se and are words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of PLAINTIFF'S profession, trade and business and therefore do not require proof of actual damages therefrom.

142. These DEFENDANTS' statements to these third parties, from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace against PLAINTIFFS and undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge.

143. These DEFENDANTS clearly and unmistakably imply the allegation of undisclosed false and defamatory facts that CONSULTANT, DENA, CHARLES, JACKSON and CONSULTANT'S employee, Joe Malugen, did not provide to the CENTER during construction or operation of the CENTER, equipment that was suited for its intended purpose in the CENTER or did not manage the equipment in the CENTER properly during the time CONSULTANT acted as General Manager of the CENTER.

144. MATTHEW JEFFERY published or caused these defamatory statements to be published to third parties including other DEFENDANTS before he was hired as an agent of DEFENDANTS. MATTHEW JEFFERY'S false and defamatory statements were of and concerning CONSULTANT and DENA, and contained the false statements noted above.

145. DEFENDANTS' false and defamatory statements were published with negligence or the intent to harm the good names and reputations of CONSULTANT, DENA, CHARLES and JACKSON.

146. MATTHEW JEFFERY published these false and defamatory statements with negligence, gross negligence or actual malice with knowledge that the statements were false, or with reckless disregard of whether they were false or not.

147. DEFENDANTS were aware that the statements were defamatory and false, and harm to the PLAINTIFFS character and reputation was apparent to any reasonably prudent viewer or editor of the publications.

148. Since their actions, these false and defamatory statements published by MATTHEW JEFFERY regarding PLAINTIFFS have remained uncorrected and PLAINTIFFS have no means of correcting these false and defamatory statements or correcting their impact on the third parties published to who work with PLAINTIFFS to conduct their business.

149. Any listener to MATTHEW JEFFERY'S statements could have reasonably understood this communication, taken in context, to have been intended in a defamatory sense against CONSULTANT, DENA, CHARLES, JACKSON and their employee Joe Malugen.

150. PLAINTIFFS have suffered from distress, lost sleep, depression, stress induced declining health, have felt insulted and PLAINTIFF'S reputations and business were besmirched.

151. As a direct and proximate result of DEFENDANTS' intentional and malicious, false and defamatory statements, PLAINTIFFS have been and will continue to be damaged and injured in their respective characters, businesses and reputations.

152. PLAINTIFFS pray that this Court will award damages against these DEFENDANTS for defaming PLAINTIFFS before these third parties.

## COUNT 3

### DEFAMATION PER SE BY SLANDER PER SE BY DEFENDANTS AND MATTHEW JEFFERY

153. PLAINTIFFS restate and reaver each and every allegation contained in the preceding or subsequent paragraphs of this COMPLAINT as if fully set forth herein.

154. PLAINTIFFS believe, and on such information and belief allege, that each of the aforementioned DEFENDANTS by their agent MATTHEW JEFFERY and MATTHEW JEFFERY, individually, published and willfully or recklessly, maliciously, and intentionally inflicted false and defamatory statements by SLANDER Per Se concerning PLAINTIFFS' name, business and reputation to Richard Maylott, owner of Northeast Insurance Center and his and the CENTER'S general liability insurance carrier, by making false, malicious and intentional statements about the PLAINTIFFS, the PLAINTIFF'S employees and the PLAINTIFF'S business without just cause with intent of harming PLAINTIFFS and as a direct and proximate cause of DEFENDANTS and their agent's actions, PLAINTIFFS were irreparably harmed by DEFENDANTS and their agents.

155. On or about February 15, 2021, MATTHEW JEFFERY, individually and as agent of DEFENDANTS made a telephone call to Richard Maylott, owner of Northeast Insurance Center in Cape Coral, Florida.  This call occurred about 15 days following his assumption of the General Manager position at the CENTER, having replaced CONSULTANT as General Manager.  Northeast Insurance Center was the general liability agent for the general liability insurance carrier of the CENTER at that time.  MATTHEW JEFFERY told Richard Maylott that there had been a customer incident and injury in the go-kart and racetrack area of the CENTER the prior day and he called to report the incident to the agent and carrier.  Richard Maylott asked if there was an Incident Report and a security camera video of the incident available so Richard Maylott could provide those documents to the insurance carrier.

156. MATTHEW JEFFERY replied to Richard Maylott that he had reviewed and observed the CENTER video security camera saved records and data base at the time of the incident and injury, but there was no security camera video of the incident and injury observable in that incident location nor any retained video because "about half of the security cameras covering the racetrack area are not working." Richard Maylott answered, that Joe Malugen, an employee of the CONSULTANT had told Richard Maylott previously that there were many video security cameras working all over most of the CENTER areas.  MATTHEW JEFFERY denied that the video cameras were working and stated he did not have a video of the incident and injury due to "about half of the video security cameras in the racetrack for go-karts were not working." These statements concerned Richard Maylott who was the representative of the general liability insurance carrier and these statements raised questions in his mind about the truth, veracity and character of Joe Malugen and

CONSULTANT, who had previously told him there were a large number of video security cameras available and working to cover most areas of the CENTER. Richard Maylott was previously aware that Joe Malugen and CONSULTANT were no longer working at the CENTER after January 31, 2021.

157. Richard Maylott finished his telephone conversation with MATTHEW JEFFERY after getting details of the incident and immediately telephoned Joe Malugen, telling him that he was concerned when told by MATTHEW JEFFERY that about half the video security cameras in the racetrack area of the CENTER were not working. Richard Maylott stated to Joe Malugen that such an occurrence would reflect poorly on the CENTER, on Joe Malugen and CONSULTANT with the current general liability insurance carrier, because working video security cameras were an important condition of the insurance carrier being willing to assume the general liability risk for the CENTER. Richard Maylott told Joe Malugen that he remembered Joe Malugen previously telling him that the video security cameras were in place and functioning properly and that he had believed that statement by Joe Malugen. This statement was just contradicted as false by MATTHEW JEFFERY. Joe Malugen then responded that there were 86 video security cameras in the CENTER when he left the CENTER on January 31, 2021, that 5 were not functioning when he left the CENTER, but that those cameras could and should be repaired by any General Manager in charge of maintaining the CENTER. Richard Maylott stated that such an allegation, if true would reflect poorly on the CONSULTANT and Joe Malugen and affect their business character and reputation for future dealings with Richard Maylott and any insurance carriers. Joe Malugen told Richard Maylott that there were at that date 29 video security cameras in the racetrack go-kart area consisting of about 30,000 square feet which is about industry standard camera coverage recommended for such an amount of square footage. Malugen stated he would inspect the video security system for problems, but that it is possible that a small portion of some areas of the CENTER might not be covered fully by the 86 cameras. The telephone conversation then ended.

158. Later that day, Joe Malugen telephoned Richard Maylott and stated to him that all 29 video security cameras in the racetrack were functioning properly, that there might be 1 or 2 not functioning but that certainly 95%-98% of the video security cameras were functioning properly in the racetrack go-kart area and the CENTER at the time of the injury incident and were then presently functioning. Richard Maylott stated that either Joe Malugen or MATTHEW JEFFERY was untruthful about the video security cameras being working, and that MATTHEW JEFFERY is the General Manager of the CENTER and Richard Maylott would have to accept his statement that "about half of the video security cameras are not working." Richard Maylott said he had no choice but to accept the statement by MATTHEW JEFFERY. Joe Malugen then stated to Richard Maylott that MATTHEW JEFFERY was lying and that Joe Malugen could prove he was lying because he had hard copy evidence of the video camera images on that day for 81 working cameras. Richard Maylott stated that he needed the video security cameras to be working properly and he was

41

disappointed that this had become an issue that reflected badly on CONSULTANT'S and Joe Malugen's reputation.

159. MATTHEW JEFFERY'S statement was false and slanderous regarding CONSULTANT, DENA, CHARLES and JACKSON'S installation and management of the video security system in the CENTER. In fact, 81 video security cameras were working in the CENTER on the day of the injury incident, 29 were working in the racetrack go-kart areas, because CONSULTANT monitored the cameras on a daily basis and had observed and recorded them on that date. The 29 cameras are about 95-98% of all cameras in that racetrack go-kart area and the 29 number of cameras is considered an industry standard for that size square footage area. Any statement to Richard Maylott that about half the cameras were not working at the time of this incident was false and defamatory.

160. These DEFENDANTS statements to Richard Maylott now make it difficult to market CONSULTANT, DENA, CHARLES and JACKSON'S services to Richard Maylott and the limited number of general liability insurance carriers serving the family entertainment center industry without great effort by CONSULTANT, DENA, CHARLES and JACKSON to neutralize these damaging statements, because CONSULTANT, DENA, CHARLES and JACKSON have been falsely and maliciously or recklessly slandered as not being capable of managing a video camera security system in the CENTER, leaving a highly unfavorable impression of PLAINTIFFS reputation and business.

161. DEFENDANTS' statements to Richard Maylott are DEFAMATION Per Se by SLANDER Per Se and are words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of CONSULTANT, CHARLES and JACKSON'S profession, trade and business and therefore do not require proof of actual damages therefrom.

162. DEFENDANTS' statements to Richard Maylott, from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace against CONSULTANT, DENA, CHARLES and JACKSON, undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge.

163. DEFENDANTS clearly and unmistakably imply the allegation of undisclosed false and defamatory facts that CONSULTANT, DENA, CHARLES, JACKSON and CONSULTANT'S employee, Joe Malugen, did not provide to the CENTER during construction or operation of the CENTER, a video security camera system that was suited for its intended purpose in the CENTER or did not manage and maintain the video security camera system in the CENTER properly during the time CONSULTANT, DENA and Joe Malugen acted as general managers of the CENTER.

164. DEFENDANTS published or caused these defamatory statements to the third party, Richard Maylott individually and as agent for the general lability carrier for the CENTER. DEFENDANTS' false and defamatory statements were of and concerning CONSULTANT, DENA, CHARLES AND JACKSON and contained the false statements noted above.

165. DEFENDANTS' false and defamatory statements were published with negligence or the intent to harm CONSULTANT, DENA, CHARLES and JACKSON'S good names and reputations.

166. DEFENDANTS published these false and defamatory statements with negligence, gross negligence or actual malice with knowledge that the statements were false, or with reckless disregard of whether they were false or not.

42

167. DEFENDANTS were aware that the statements were defamatory and false, and harm to the PLAINTIFFS character and reputation was apparent to any reasonably prudent viewer or editor of the publications.

168. Since their actions, these false and defamatory statements published by these DEFENDANTS regarding CONSULTANT, DENA, CHARLES and JACKSON have remained uncorrected and CONSULTANT, DENA, CHARLES and JACKSON have no means of correcting these false and defamatory statements or correcting their impact on Richard Maylott, a longtime business associate of CONSULTANT who works with many insurance carriers necessary for CONSULTANT, DENA, CHARLES and JACKSON to conduct their business and the general liability insurance carrier of the CENTER who CONSULTANT has done continuing business with for about 5 years.

169. In carrying out the Slanderous conduct, DEFENDANTS acted negligently, willfully, maliciously, and/or with reckless indifference to the consequences of their actions against CONSULTANT, DENA, CHARLES and JACKSON.

170. Any listener to MATTHEW JEFFERY'S statements to Richard Maylott could have reasonably understood this communication, taken in context, to have been intended in a defamatory sense against CONSULTANT, DENA, CHARLES, JACKSON and employee Joe Malugen.

171. CONSULTANT, DENA, its employees, CHARLES and JACKSON have suffered from distress, depression, lost sleep, stress induced declining health, have felt insulted and CONSULTANT, DENA, its employees, CHARLES and JACKSON'S reputations were besmirched.

172. As a direct and proximate result of DEFENDANTS' intentional and malicious, false and defamatory statements, CONSULTANT, DENA, CHARLES and JACKSON have been and will continue to be damaged and injured in their respective businesses and reputations.

173. CONSULTANT, DENA, CHARLES and JACKSON pray that this Court will award damages against DEFENDANTS for defamation published to Richard Maylott and the General Liability Insurance carrier, Golden Bear Insurance Company.

## COUNT 4

### DEFAMATION PER SE BY LIBEL PER SE BY DEFENDANTS AND DEFENDANT MATTHEW JEFFERY

174. PLAINTIFFS restate and reaver each and every allegation contained in the preceding or subsequent paragraphs of this COMPLAINT as if fully set forth herein.

175. On or about February 7, 2021, one week after CONSULTANT had left the management of the CENTER and several days after MATTHEW JEFFERY individually and as agent for MERIDIAN BEVCO, as General Manager, had released employee TY from employment as Events and Party Manager, the CENTER hosted a party for a customer named "Nathan Barry."

176. Nathan Barry was very disappointed with the party experience provided by MATTHEW JEFFERY and the NEW MANAGEMENT TEAM at the CENTER, so he proceeded thereafter to publish and post on the Facebook.com Hype! Adventures Meridian website page on the World-Wide Web, available to billions of Facebook users, a negative customer review of the CENTER business and party planning as follows:

43

"Nathan Barry doesn't recommend Hype Adventures

Most unorganized and unprofessional place.  Staff is a complete joke, and I do not recommend ever having a party there.  Especially for the price of it.  Rude employees.  Hostess never to be found.  Had an hour and a half of our 3 hour party wasted from sitting around and waiting.  Room was not even close to being in order upon arrival.  Couldn't even get food or drinks that was paid for ahead of time, or even get utensils to eat with.  My daughters birthday was a complete unorganized mess because of the staff.  To top it off half of the stuff in there was blocked off or out of service."

177. On or about March 14, 2021, five weeks later, MATTHEW JEFFERY finally got around to checking his Facebook Hype Adventures webpage, saw Nathan Barry's negative customer review of the CENTER, and responded by publishing and posting the following on the same Hype Adventures Meridian webpage on Facebook the following response available to the same vast audience:
   HYPE ADVENTURES

   Hi Nathan, We are sorry that you had a bad experience.  We are now under new management with many new staff.  Give us a try again sometime.

178. MATTHEW JEFFERY'S response was false, defamatory and LIBEL Per Se against CONSULTANT, as well as against former employee TY, as MATTHEW JEFFERY had assumed management of the CENTER on February 1, 2021, a week earlier, and obviously attempted to place fault and blame for Nathan Barry and his daughter's  bad party experience away from himself and on the prior management team which included CONSULTANT and TY, who were no longer employed at the CENTER at the time of the disastrous Nathan Barry party.  MATTHEW JEFFERY was in fact the "prior management" he falsely criticizes and which he claims caused Nathan Barry's terrible party experience.  There was no "new management" after MATTHEW JEFFERY assumed management on February 1, 2021.  This action by MATTHEW JEFFERY was intentional, with malice against CONSULTANT, DENA and TY, as the community of Meridian, MS was generally familiar with CONSULTANT, DENA and TY as the previous "management" team replaced by MATTHEW JEFFERY.

179. MATTHEW JEFFERY'S statements accessible to millions of people on the World-Wide Web and to Nathan Barry now make it difficult to market CONSULTANT, DENA and TY'S services to the family entertainment center industry, to the advertising, promotional and marketing industry and even to the general public without great effort by CONSULTANT, DENA and TY to neutralize these damaging statements, because CONSULTANT, DENA and TY have been falsely and maliciously or recklessly libeled as not being capable of managing the CENTER and parties properly, leaving customers and others with a highly unfavorable impression of CONSULTANT'S, DENA'S and TY'S character, reputation and business.

180. MATTHEW JEFFERY'S statements are DEFAMATION Per Se by LIBEL Per Se and are words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of

CONSULTANT'S, DENA'S and TY'S profession, trade and business and therefore do not require proof of actual damages therefrom.

181. MATTHEW JEFFERY'S statements from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace against CONSULTANT, DENA and TY, undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge.

182. MATTHEW JEFFERY'S statement clearly and unmistakably implies the allegation of undisclosed false and defamatory facts that CONSULTANT, DENA and TY did not provide adequate management to the CENTER during their operations as General Manager and Events and Party Manager of the CENTER prior to MATTHEW JEFFERY assuming control.

183. These DEFENDANTS published or caused these defamatory statements to the third party, Nathan Barry, and accessible to billions of people on the World-Wide Web. These DEFENDANTS' false and defamatory statements were of and concerning CONSULTANT, DENA and TY, and contained the false statements noted above.

184. These DEFENDANTS' false and defamatory statements were published with negligence or the intent to harm CONSULTANT'S, DENA'S and TY'S good name and reputation.

185. These DEFENDANTS published these false and defamatory statements with negligence, gross negligence or actual malice with knowledge that the statements were false, or with reckless disregard of whether they were false or not.

186. Since their actions, these false and defamatory statements published by these DEFENDANTS regarding CONSULTANT, DENA and TY have remained uncorrected and CONSULTANT, DENA and TY have no means of correcting these false and defamatory statements or correcting their impact on Nathan Barry or users of the Hype Adventures webpage on Facebook for CONSULTANT and TY to conduct their business.

187. Since their posting, these statements published by these DEFENDANTS regarding CONSULTANT, DENA and TY have remained available to billions of Internet users, many of whom may have made copies of the false and defamatory statements and/or distributed or reposted them by electronic mail or other means and/or re-posted them to other websites, Internet forums, and message boards, and CONSULTANT, DENA and TY have no means of removing these false and derogatory statements or removing their impact on people from the World-Wide Web Internet.

188. In carrying out the Libelous conduct, these DEFENDANTS acted negligently, willfully, maliciously, and/or with reckless indifference to the consequences of their actions against CONSULTANT, DENA and TY.

189. DEFENDANTS were aware that the statements were defamatory and false, and harm to the PLAINTIFFS character and reputation was apparent to any reasonably prudent viewer or editor of the publications.

190. Any listener to MATTHEW JEFFERY'S statements could have reasonably understood this communication, taken in context, to have been intended in a condemning, derogatory sense against CONSULTANT and TY because MATTHEW JEFFERY was in fact the "prior management" he falsely criticizes and which he claims caused Nathan Barry's terrible party experience.  There was no "new management" after MATTHEW JEFFERY assumed management.

45

191. CONSULTANT'S employees, DENA and TY have suffered from depression, distress, lost sleep, stress induced declining health, have felt insulted and CONSULTANT and TY'S character, reputation and business was besmirched.

192. As a direct and proximate result of these DEFENDANTS' intentional and malicious, false and defamatory statements, CONSULTANT, DENA and TY have been and will continue to be damaged and injured in their good names, character, business and reputation.

193. PLAINTIFFS pray that this Court will award damages against these DEFENDANTS defaming and libeling CONSULTANT, DENA and TY before Nathan Barry and a vast number of the general public.

### COUNT 5

### DEFAMATION PER SE BY SLANDER PER SE BY DEFENDANTS AND DEFENDANT ELISHA D. JEFFERY

194. PLAINTIFFS restate and reaver each and every allegation contained in the preceding or subsequent paragraphs of this Complaint as if fully set forth herein.

195. ELISHA D. JEFFERY, individually and as agent of MERIDIAN BEVCO, met with Christopher Rhodes, sales representative of Ben. E. Keith Food Distributors, Inc., on or about February 15, 2021, regarding the food supply order for the Café in the CENTER. The conversation occurred in the Café of the CENTER. ELISHA D. JEFFERY who was acting as the manager for the café and was placing food orders, stated in the conversation that the CONSULTANT'S Café was faulty in design and operation, that the menu was wrong, that she was making needed changes and that CONSULTANT had obligated MERIDIAN BEVCO to several long-term food supply contracts with suppliers and vendors that she claimed were "bad long-term agreements" putting MERIDIAN BEVCO in an "upside down " position both financially and operationally, that they could not terminate and replace. Christopher Rhodes asked ELISHA D. JEFFERY what those agreements consisted of, but she declined to detail them. Christopher Rhodes contacted CONSULTANT employee Joe Malugen a few days after this conversation and stated, that ELISHA D. JEFFERY "doesn't think you know what you are doing in the food business." He proceeded to tell Joe Malugen what ELISHA D. JEFFERY had said. He asked Joe Malugen what were the long-term agreements for food supply that ELISHA D. JEFFERY was claiming Joe Malugen had damaged MERIDIAN BEVCO with, because ELISHA D. JEFFERY was claiming that Joe Malugen did not know the food retail business by entering MERIDIAN BEVCO into several bad long-term agreements. Joe Malugen stated to Christopher Rhodes that ELISHA D. JEFFERY was making false statements because there were no long-term agreements for food supplies, except the ICEE frozen drink machine, which was the Number 1 seller in the café and a very favorable business agreement with the most popular frozen drink company in the USA. Christopher Rhodes noted to Joe Malugen that the Sales in the Café in the past had been better than he expected, so he did not understand how ELISHA D. JEFFERY intended to improve Sales. Christopher Rhodes ended the conversation stating that "well, ELISHA D. JEFFERY sure says you created some bad contracts for Hype!"

196. The facts will show that Joe Malugen or CONSULTANT did not bind MERIDIAN BEVCO to any bad long term food supply agreements from a financial or operational standpoint and that the Café operated successfully with high Sales levels under the "HYPE BUSINESS PLAN" until such plan was terminated by DEFENDANTS. The facts will show that ELISHA D. JEFFERY individually and as part of a plan to conspire to falsely defame CONSULTANT by SLANDER Per Se to a third party in the food supply industry, defamed and damaged CONSULTANT'S reputation, business and character. The facts will also show that ELISHA D. JEFFERY'S new Café business plan was a complete failure operationally and that food Sales in the café dropped substantially following her changes of food suppliers, café layout, food menu and pricing soon after she assumed management control of the Café.

197. PLAINTIFFS believe, and on such information and belief allege, that each of the aforementioned DEFENDANTS by their agent ELISHA D. JEFFERY, her individually, published and willfully or recklessly, maliciously, and intentionally inflicted false and defamatory statements by SLANDER Per Se concerning CONSULTANT'S name, business and reputation to Christopher Rhodes, by making false, malicious and intentional statements about the CONSULTANT, the CONSULTANT'S employees and the CONSULTANT'S business, without just cause, with intent of harming CONSULTANT and as a direct and proximate cause of these DEFENDANTS and their agents actions, CONSULTANT was irreparably harmed by DEFENDANTS and their agents.

198. DEFENDANTS statements to Christopher Rhodes now make it difficult to market CONSULTANT'S services to Christopher Rhodes and Ben E. Keith Food Distributors serving the family entertainment center industry without great effort by CONSULTANT to neutralize these damaging statements, because CONSULTANT has been falsely and maliciously or recklessly slandered as not being capable of designing or managing the Café in the CENTER, leaving a highly unfavorable impression of CONSULTANT'S reputation and business.

199. DEFENDANTS' statements to Christopher Rhodes are DEFAMATION Per Se by SLANDER Per Se and are words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of CONSULTANT'S profession, trade and business and therefore do not require proof of actual damages therefrom.

200. These DEFENDANT'S statements to Christopher Rhodes, from their usual construction and common acceptation, are considered as insults, and calculated to lead to a breach of the peace against CONSULTANT, undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge.

201. DEFENDANTS clearly and unmistakably imply the allegation of undisclosed false and defamatory facts that CONSULTANT, and CONSULTANT'S employee, Joe Malugen, did not provide to the CENTER during construction or operation of the CENTER, café and food systems that were suited for its intended purpose in the CENTER or did not manage the café and food systems in the CENTER properly during the time CONSULTANT and employee Joe Malugen acted as consultant and general manager of the CENTER.

202. DEFENDANTS published or caused these defamatory statements to the third party, Christopher Rhodes individually and to Ben E. Keith Food Distributors. DEFENDANTS' false

and defamatory statements were of and concerning PLAINTIFF CONSULTANT, and contained the false statements noted above.

203. DEFENDANTS' false and defamatory statements were published with negligence or the intent to harm PLAINTIFF CONSULTANT'S good name and reputation.

204. DEFENDANTS published these false and defamatory statements with negligence, gross negligence or actual malice with knowledge that the statements were false, or with reckless disregard of whether they were false or not.

205. DEFENDANTS were aware that the statements were defamatory and false, and harm to the PLAINTIFFS character and reputation was apparent to any reasonably prudent viewer or editor of the publications.

206. Since their actions, these false and defamatory statements published by DEFENDANTS regarding CONSULTANT have remained uncorrected and CONSULTANT has no means of correcting these false and defamatory statements or correcting their impact on Christopher Rhodes and Ben E. Keith Food Distributors, a longtime business associate of CONSULTANT who works with many family entertainment centers necessary for CONSULTANT to conduct their business, as well as the former food distributor of the CENTER who CONSULTANT has done continuing business with for about 5 years.

207. In carrying out the Slanderous conduct, these DEFENDANTS acted negligently, willfully, maliciously, and/or with reckless indifference to the consequences of their actions against CONSULTANT.

208. Any listener to ELISHA D. JEFFERY'S statements to Christopher Rhodes could have reasonably understood this communication, taken in context, to have been intended in a defamatory sense against CONSULTANT, and its employee Joe Malugen.

209. CONSULTANT and its employees have suffered from lost sleep, stress induced declining health, have felt insulted and CONSULTANT'S reputation was besmirched.

210. As a direct and proximate result of DEFENDANTS' intentional and malicious, false and defamatory statements, CONSULTANT has been and will continue to be damaged and injured in its business and reputation.

211. CONSULTANT prays that this Court will award damages against ELISHA D. JEFFERY and the other DEFENDANT companies for falsely defaming CONSULTANT to Christopher Rhodes and Ben E. Keith Food Distributors.

## COUNT 6

### DECEITFUL BUSINESS PRACTICES AND MALICIOUS AND INTENTIONAL FRAUD

212. PLAINTIFFS restate and reaver each and every allegation contained in the preceding or subsequent paragraphs of this Complaint as if fully set forth herein.

213. DEFENDANTS ANDY WEINER, ROCKSTEP MERIDIAN and MERIDIAN BEVCO assured CONSULTANT that they would reimburse CONSULTANT'S reasonable travel, food and entertainment expenses while working for DEFENDANTS regarding the CENTER and pay the $25,000 fixed fee that remains unpaid of the $100,000 fee as agreed by the Parties in the AGREEMENT plus pay the 10% of monthly "Net Earnings" EBITDA consulting fee under the

AGREEMENT.  Plaintiffs relied on such assurances in agreeing to engage for about 90 days acting as General Managers of Defendants CENTER, without any further compensation. Plaintiffs had no duty under the existing AGREEMENT to act as the General Manager of the CENTER, but did so, to their detriment, due to DEFENDANT'S promises.

214. CONSULTANT believes, and on such information and belief alleges, that each of the aforementioned DEFENDANTS published these promises to CONSULTANT to entice them to manage the CENTER for 90 days without compensation, then later retracted and denied any such liability to pay CONSULTANT, and willfully, maliciously, and intentionally ENGAGED IN deceitful business practices and malicious and intentional fraud that were calculated to harm the CONSULTANT and their business without just cause, and as a direct and proximate cause of DEFENDANT'S and their agents' actions, CONSULTANT was irreparably harmed by these DEFENDANTS and their agents.

215.  DEFENDANTS actions were undertaken without just cause, in a state of mind, which evidences hatred, ill will, or a spirit of revenge, which vile actions should be punished by this Court.

216. As a direct and proximate result of DEFENDANTS' actions above, CONSULTANT has been and will continue to be damaged and injured due to their failure to complete their promises.

217. PLAINTIFFS pray that this Court will award damages against DEFENDANTS for their deceitful business practices and intentional fraud.

## COUNT 7

### WRONGFUL INVASION OF PRIVACY HOLDING CONSULTANT, DENA AND TY TO THE PUBLIC EYE IN A FALSE LIGHT BY MATTHEW JEFFERY

218. CONSULTANT restates and reavers each and every allegation contained in the preceding or subsequent paragraphs of this Complaint as if fully set forth herein.

219. CONSULTANT believes, and on such information and belief alleges, that each of the aforementioned DEFENDANTS and MATTHEW JEFFERY, individually and as agent of DEFENDANTS, published willfully or recklessly, maliciously, and intentionally inflicted false and derogatory statements to the general public placing CONSULTANT, DENA and TY in a False Light by publishing an unfair impression of CONSULTANT'S, DENA and TY'S name, character, business and reputation, which resulted in the offense or embarrassment that arises from a misleading or untrue implication. This was done within the community of this Court and across the United States, to the CONSULTANT, DENA, CONSULTANT'S employees, and the CONSULTANT'S business as well as TY and TY'S chosen employment position, without just cause, with intent of harming CONSULTANT, DENA and TY and as a direct and proximate cause of these DEFENDANTS and their agents' actions, CONSULTANT, DENA and TY were irreparably harmed by these DEFENDANTS and their agents.

220. ROCKSTEP CAPITAL, LLC, ROCKSTEP CAPITAL CORPORATION, ROCKSTEP MERIDIAN AND MERIDIAN BEVCO retained MATTHEW JEFFERY, who was and is not experienced in family entertainment center operations, as their agent and employee on about January 20, 2021,

regarding general managing operation of the CENTER.  He worked at the CENTER in Meridian, MS after January 31, 2021, and continues today uninterrupted as an agent of these DEFENDANTS.

221. DEFENDANTS MERIDIAN BEVCO, ROCKSTEP MERIDIAN, ROCKSTEP CAPITAL COMPANY,  and ROCKSTEP CAPITAL CORPORATION by and through their agent MATTHEW JEFFERY and DEFENDANT MATTHEW JEFFERY, individually and as their agent, willfully and recklessly undertook to publish and disseminate a written false and/or disparaging allegation apparent to any reasonable person, alleging or implying CONSULTANT, DENA and TY were the General Manager and Events and Party Manager of the CENTER on February 7, 2021, and that MATTHEW JEFFERY had replaced these PLAINTIFFS as managers thereafter, because CONSULTANT, DENA and TY did a poor, failed job managing Nathan Barry's party that day.

222. On or about February 7, 2021, one week after CONSULTANT had left the management of the CENTER and several days after MATTHEW JEFFERY individually and as agent for MERIDIAN BEVCO, as General Manager, had released TY from her employment as Events and Party Manager, the CENTER hosted a party for a customer named "Nathan Barry."

223. Nathan Barry was very disappointed in the party experience provided by MATTHEW JEFFERY management at the CENTER so he proceeded thereafter to publish and post on the Facebook Hype Adventures Meridian website page on the World-Wide Web, available to millions of Facebook.com users, a very negative customer review of the event, CENTER business and party planning, as follows:

> **"Nathan Barry doesn't recommend Hype Adventures**
>
> **Most unorganized and unprofessional place.  Staff is a complete joke, and I do not recommend ever having a party there.  Especially for the price of it.  Rude employees.  Hostess never to be found.  Had an hour and a half of our 3 hour party wasted from sitting around and waiting.  Room was not even close to being in order upon arrival.  Couldn't even get food or drinks that was paid for ahead of time, or even get utensils to eat with.  My daughters birthday was a complete unorganized mess because of the staff.  To top it off half of the stuff in there was blocked off or out of service."**

224. On or about March 14, 2021, 5 weeks after the post, MATTHEW JEFFERY finally got around to doing his general manager job and checking his Facebook Hype Adventures webpage, and saw Nathan Barry's negative review of the CENTER, and responded by publishing and posting the following on the same Hype Adventures Meridian website page on Facebook.com the following response:
"**HYPE ADVENTURES**

> **Hi Nathan, We are sorry that you had a bad experience.  We are now under new management with many new staff.  Give us a try again sometime."**

225. DEFENDANTS through their agent's actions, by MATTHEW JEFFERY'S wrongful invasion of CONSULTANT'S, DENA'S and TY'S privacy, have caused CONSULTANT, DENA and TY to suffer emotionally and financially from the unfavorable impression of CONSULTANT and TY created by these DEFENDANTS, and the offensive and embarrassing publications about CONSULTANT, DENA and TY to DEFENDANT'S Hype Adventures Meridian Facebook.com page, accessible to anyone on the World-Wide Web. This large public group which includes both CONSULTANT, DENA and TY, is made up of all persons interested in the Hype! Adventure's brand and business as well as existing and potential customers of any Hype! Adventures family entertainment center anywhere or to be built.

226. These DEFENDANTS' misleading and untrue implications regarding CONSULTANT, DENA and TY'S reputation and business were made with willful or reckless disregard for the truth.

227. DEFENDANTS were aware or should have been aware that the statements were false, and harm to the PLAINTIFFS character and reputation was apparent to any reasonably prudent viewer or editor of the publications.

228. These DEFENDANTS have negatively impacted CONSULTANT'S, DENA and TY'S character, reputation and business to the entire World-Wide Web and HYPE! Adventures customers, with no existing present opportunity to correct this false and damaging publication, as it is abundantly clear to any reasonable person that CONSULTANT, DENA and TY were the CENTER "management" replaced by these DEFENDANTS who were the "new management" operating the CENTER.

229. DEFENDANTS published statements on FACEBOOK describing the CONSULTANT and TY as the "management" of the CENTER known as "HYPE! ADVENTURES" on February 7, 2021, and that MATTHEW JEFFERY was now managing in a much better manner, replacing CONSULTANT, DENA and TY at the CENTER in order to fix the previous management errors and mistakes of CONSULTANT, DENA and TY. These actions clearly identified CONSULTANT, DENA and TY in an offensive and embarrassing light and created an unfavorable impression as to CONSULTANT, DENA and TY'S good name, character, reputation and business.

230. CONSULTANT, DENA and TY are required to work with persons viewing this false publication to develop their Hype! Adventures brand in order to build their business in this family entertainment center industry. TY is required to work with persons viewing this false publication to develop her existing advertising, promotional and marketing business. Such publication undoubtedly left lasting impressions on those many individuals regarding CONSULTANT'S, DENA'S and TY'S good name, character, reputation and business.

231. These DEFENDANTS' publications now make it difficult to market CONSULTANT'S, DENA'S and TY'S services to this large FACEBOOK group or to the entire family entertainment center industry or any other industry without great effort by CONSULTANT, DENA and TY to neutralize such damaging publication, because CONSULTANT, DENA and TY have been falsely and recklessly placed in an embarrassing and offensive light leaving a highly unfavorable impression of CONSULTANT'S, DENA'S and TY'S good name, character, reputation and business.

232. Since their posting, these False Light statements published by these DEFENDANTS regarding CONSULTANT, DENA and TY have remained available to billions of Internet

users, many of whom may have made copies of the false and defamatory statements and/or distributed or reposted them by electronic mail or other means and/or re-posted them to other websites, Internet forums, and message boards, and CONSULTANT, DENA and TY have no means of removing these false and derogatory statements or removing their impact on people from the Internet.

233. DEFENDANTS' statements are highly offensive and embarrassing to a reasonable person.

234. DEFENDANTS are at fault and knew or were negligent or in reckless disregard or intentional as to the falsehood of their statements above, undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge.

235. DEFENDANTS' actions caused CONSULTANT, DENA and TY to suffer and will continue to suffer from the offense and embarrassment that arises from DEFENDANTS' misleading and untrue implications creating an unfair impression of CONSULTANT, DENA and TY.

236. As a direct and proximate result of DEFENDANTS' statements above, CONSULTANT, DENA and TY have been and will continue to be damaged and injured in their respective good names, characters, reputations and business.

237. CONSULTANT, DENA and TY pray that this Court will award damages against DEFENDANTS for placing the CONSULTANT, DENA and TY before a vast number of the general public in a False Light.

## COUNT 8

### WRONGFUL INVASION OF PRIVACY HOLDING PLAINTIFFS TO THE PUBLIC EYE IN A FALSE LIGHT BY GREGG BORMAN, SR.

238. PLAINTIFFS restate and reaver each and every allegation contained in the preceding or subsequent paragraphs of this Complaint as if fully set forth herein.

239. PLAINTIFFS believe, and on such information and belief allege, that each of the aforementioned DEFENDANT companies and GREGG BORMAN, SR., individually and as agent of DEFENDANTS, published and negligently, willfully or recklessly, maliciously, or intentionally inflicted false and derogatory statements to the general public placing PLAINTIFFS in a False Light by publishing an unfair impression of PLAINTIFFS' names, characters, business and reputations, which resulted in the offense or embarrassment that arises from a misleading or untrue implication. This was done within the community of this Court and across the World, to the CONSULTANT, DENA, CHARLES and JACKSON and their businesses, without just cause, with negligence, reckless disregard, or intent of harming these PLAINTIFFS and as a direct and proximate cause of DEFENDANTS and their agents' actions, these PLAINTIFFS were irreparably harmed by these DEFENDANTS and GREGG BORMAN, SR, individually and as agent of DEFENDANTS.

240. ROCKSTEP CAPITAL, LLC, ROCKSTEP CAPITAL CORPORATION, ROCKSTEP MERIDIAN AND MERIDIAN BEVCO retained GREGG BORMAN, SR., who is experienced in family entertainment center operations in urban USA markets, as their agent, consultant and employee on or about June, 2021, to advise them regarding operation of the CENTER.  He worked at the CENTER in Meridian, MS on or about July 5-9, 2021, as well as August 25-28, 2021 and continues today uninterrupted as an employee and agent of DEFENDANTS.

241. DEFENDANTS MERIDIAN BEVCO, ROCKSTEP MERIDIAN, ROCKSTEP CAPITAL 1, and ROCKSTEP CAPITAL 2 by and through their agent GREGG BORMAN, SR. and DEFENDANT GREGG BORMAN, SR., individually, negligently, willfully and recklessly undertook to publish and disseminate a series of written false and/or disparaging allegations, apparent to any reasonable person, alleging or implying these PLAINTIFFS had (1) Criminally Bribed and Corrupted DEFENDANT'S vendor suppliers and had accepted financial kickbacks from equipment vendors utilized by CONSULTANT in the CENTER through "Backend Deals" in violation of the AGREEMENT, which constitutes both civil and criminal fraudulent conduct by these PLAINTIFFS against DEFENDANTS, as such conduct was specifically prohibited in the AGREEMENT and is a statutory crime in the State of Mississippi, (2) had given the CENTER owners bad business advice regarding layout and equipment selections of the CENTER, (3) had misled, deceived and defrauded MERIDIAN BEVCO and ROCKSTEP MERIDIAN in the design, buildout and operation of the CENTER business, again both actionable legal civil claims and criminal acts in the State of Mississippi, (4) that the CENTER'S 30 or so arcade games and activities installed by CONSULTANT in the CENTER were not in fact an "arcade" at all and whatever games are located therein were a bad business mistake, (5) that CONSULTANT'S employees CHARLES and JACKSON were not competent in the family entertainment center business or the Virtual Reality VR business, to plan, install, operate or advise the CENTER owners on the Virtual Reality VR Games which were installed within the CENTER by CONSULTANT, CHARLES and JACKSON, (6) that CONSULTANT, CHARLES and JACKSON chose to utilize shoddy, cheap, less than state of the art Virtual Reality VR equipment then available for the CENTER'S intended use, (7) with no reasonable analysis done by CONSULTANT as to the cost to value relationship of the equipment compared to the business needs of the CENTER.  GREGG BORMAN, SR.  further inferred that (8) CHARLES and JACKSON were incompetent to properly perform these services to DEFENDANTS and that such equipment installed by these PLAINTIFFS is inferior or unsuited for its intended purpose, the CENTER business plan and the CENTER equipment cost budget.

242. On or about July 5, 2021 DEFENDANT GREGG BORMAN, SR. made a public disclosure, published and disseminated on his personal FACEBOOK Page at www.facebook.com, which is named "GREGG Borman Sr", which page is published and accessible to all billions of FACEBOOK website members and others and then also published to his FACEBOOK FEC (Family Entertainment Center) Operators private group page, which is published to over 2,200 family entertainment center industry professionals and companies, including even CONSULTANT, DENA and TY being members of this Facebook FEC Operators group.  He published and stated that he was traveling to Meridian, MS at the request of ROCKSTEP CAPITAL, LLC or ROCKSTEP CAPITAL CORPORATION, a "PE" (private equity investment) firm.  He published the following:

> **"Another PE group is talking to me about developing an indoor entertainment concept for their 100k square foot former anchor boxes at the malls they own.  Going to Meridian to see what can be done to correct what a previous consultant mislead them into building in one of their malls."**

243. On or about July 6, 2021, DEFENDANT GREGG BORMAN, SR. published and disseminated on FACEBOOK FEC (Family Entertainment Center) Operators private group page to over 2,200 industry professionals including CONSULTANT, numerous photos of the Meridian, MS HYPE! Adventures CENTER, and in response to questions to him from FACEBOOK FEC Operators private group members, he stated the following:

> In response to a question from a group member of "where is the arcade?" DEFENDANT responds "the original managing partner didn't put one in.  That was their first mistake.  Layout is not really good for operational flow is another. Everything they put in was purchased from China.  He sold the idea to the Owners on being able to put these into empty anchor boxes on the cheap,"
> "It blows me away on the things some CONSULTANT do and suggest.  I am not a consultant and I do not take any backend deals from suggesting a vendor.  I am helping some PE groups while deciding what I want to do next.  **The Laser Tag equipment is from Russia, the carts, tramps, rock wall, adventure course are from China.  They can't adjust the default speed for the go-karts without having a late-night call with a tech in China connecting into their system to change speeds for them.  Even the tables and chairs are from China.  The VR was created by the original guy's kids using four computers and off-the-shelf headsets and software.  There is a lot of refinements needed to make it a better operation."**

244. On or about July 8, 2021, DEFENDANT GREGG BORMAN, SR, continued to publish false statements about his own business knowledge and abilities on the FACEBOOK FEC group page, claiming falsely, that he was responsible for bringing in a trampoline park safety expert to inspect the CENTER, when in fact the DEFENDANT'S Liability insurance carrier demanded such inspection, by the amusement park safety expert named "Bob Ito", prior to and without any input or suggestions from any of the DEFENDANTS, by publishing the following:

> **"I had Trampoline Park inspection expert Bob Ito {former RM for Sky Zone and gymnastics coach at U of Washington} there all day yesterday…"**

245. DEFENDANTS through their agent, GREGG Borman, Sr. and DEFENDANT GREGG BORMAN, SR'S wrongful invasion of PLAINTIFF'S privacy has caused CONSULTANT, DENA, CHARLES and JACKSON to suffer emotionally and financially from the unfavorable impression of these PLAINTIFFS created by DEFENDANTS, and the offensive and embarrassing publications about these PLAINTIFFS to DEFENDANT'S personal FACEBOOK page accessible to anyone on the World-Wide Web, as well as over 2,200 individual FACEBOOK FEC Operators group members (including CONSULTANT and TY) who joined the group and are working in the family entertainment center industry along with CONSULTANT and TY.  This large business industry individuals' group is made up of an invitation-only family entertainment center industry professionals member group on the World Wide Web website www.facebook.com and the private group FACEBOOK FEC (Family Entertainment Center) Operators.

54

246. DEFENDANT GREGG BORMAN, SR'S false, misleading and untrue implications regarding CONSULTANT, DENA, CHARLES and JACKSON'S good name, character, reputations and businesses were made with negligence, willful malice or reckless disregard for the truth.

247. DEFENDANTS were aware that the statements were defamatory, placed PLAINTIFFS in a public false light and and caused harm to the PLAINTIFFS good names, business, character and reputation and was apparent to any reasonably prudent viewer or editor of the publications.

248. DEFENDANTS have negatively impacted CONSULTANT, DENA, CHARLES and JACKSON'S good names, characters, reputations and businesses to the entire World-Wide Web and this 2200-member family entertainment center industry group forever, with no existing present opportunity to correct these false and damaging publications, as it is abundantly clear to any reasonable person that DENA, CHARLES and JACKSON were the sole "consultant", "managing partner" and "the original guy's kids" referred to by DEFENDANTS publications as the ones designing, building, owning the HYPE! Adventures trade-name and operating the CENTER. DEFENDANTS published multiple statements on FACEBOOK describing these PLAINTIFFS as "consultant", "managing partner" and "the original guy's kids" who performed incompetent, corrupt and fraudulent services for DEFENDANTS, as well as published extensive photos of the actual CENTER and its activities, published photos of the trade-name and trademark "Hype! Adventures" at the CENTER which trade-name and trademark is owned by CONSULTANT and is known as "HYPE! ADVENTURES" exclusive Trade-name and Trademark, and further published the location of the CENTER, published descriptions of the CENTER, and description of activities and operation of the CENTER on this FACEBOOK Industry Group webpage and also published that GREGG BORMAN, SR. was working there to "fix" the mistakes of CONSULTANT, DENA, CHARLES and JACKSON. These actions clearly identified these PLAINTIFFS in an offensive and embarrassing light and created an unfavorable impression as to these PLAINTIFFS' characters, reputations and businesses.

249. DEFENDANTS recognized their highly offensive, damaging and reckless invasion of these PLAINTIFFS' privacy by their False Light publications against these PLAINTIFFS, subjecting DEFENDANTS to likely compensatory and punitive damages awards to punish DEFENDANTS and owed to these PLAINTIFFS, sometime during August 2021, and they intentionally entered this same FACEBOOK website and deleted all of their multiple publications referring to anything regarding these PLAINTIFFS or the CENTER, and that GREGG BORMAN, SR. was consulting with DEFENDANTS, in order to attempt to hide and bury the written evidence of such damaging publications and reduce DEFENDANTS' risks of incurring substantial damages which are now due to these PLAINTIFFS for these offensive actions. DEFENDANTS did not delete any other extensive publications by GREGG BORMAN, SR. on these Facebook websites regarding family entertainment centers, other than those referencing these PLAINTIFFS and the CENTER in Meridian, MS.

250. After his malicious conduct and his subsequent deletions of his offensive publications, GREGG BORMAN, SR. then continued his employment and agency with DEFENDANTS in August 2021, and began to post again on these same www.facebook.com accounts to identify the "Hype" branded and licensed location of CONSULTANT in Meridian, MS, indicating his employer DEFENDANTS as licensee of the Hype brand, and their urgent need

for his expert help in order to fix the problems with the CENTER, which publication continues to identify CONSULTANT'S Licensee location and defame and damage these PLAINTIFFS' character, reputations and businesses in spite of his false statement deletions previously. The new publications simply add fuel to the offensive fire that GREGG BORMAN, SR. created against these PLAINTIFFS in his previous offensive and malicious deleted publications.

251. Such damages to these PLAINTIFFS are extensive, lasting, permanent and are virtually impossible to mitigate in spite of the intentional attempt of hiding and deletions of DEFENDANT'S illegal publications. Their publications impact was published for and remained available about thirty days and were published to the billions of users of the World-Wide Web and to over 2200 individual family entertainment center industry veterans, who are the same individuals these PLAINTIFFS know and have worked with and are required to work with in order to rebuild their business in this industry, and such publications undoubtedly left lasting impressions on those many individuals regarding CONSULTANT, DENA, CHARLES and JACKSON'S good names, characters, reputations and businesses.

252. DEFENDANTS publications now make it virtually impossible to market these PLAINTIFFS' services to this large FACEBOOK FEC Operators family entertainment center industry group or to the entire family entertainment center industry, without great effort by these PLAINTIFFS to neutralize such damaging publications, because these PLAINTIFFS have been falsely and recklessly placed in an embarrassing and offensive false light leaving a highly unfavorable impression of CONSULTANT, DENA, CHARLES and JACKSON'S good names, characters, reputations and businesses.

253. Since their posting, these False Light statements published by DEFENDANTS regarding these PLAINTIFFS have remained available to millions of Internet users for about thirty days, and some of them continue, many of whom may have made copies of the false and defamatory statements and/or distributed or reposted them by electronic mail or other means and/or re-posted them to other websites, Internet forums, and message boards, and these PLAINTIFFS have no means of removing these false and derogatory statements or removing their impact on people from the World-Wide Web Internet.

254. DEFENDANTS' statements are highly offensive and embarrassing to a reasonable person. DEFENDANTS are at fault and knew or were in reckless disregard as to the falsehood of their statements above, undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge.

255. DEFENDANTS' actions caused CONSULTANT, DENA, CHARLES and JACKSON to suffer and will continue to suffer from the offense and embarrassment that arises from DEFENDANTS' misleading and untrue implications creating an unfair impression of these PLAINTIFFS.

256. As a direct and proximate result of DEFENDANTS' statements above, these PLAINTIFFS have been and will continue to be damaged and injured in their respective good names, characters, reputations and business.

257. CONSULTANT, DENA, CHARLES and JACKSON pray that this Court will award damages against DEFENDANTS for placing these PLAINTIFFS before a vast number of the general public in a False Light.

## COUNT 9

### DEFAMATION PER SE BY LIBEL PER SE BY DEFENDANTS AND GREGG BORMAN, SR.

258. CONSULTANT, DENA, CHARLES and JACKSON restate and reaver each and every allegation contained in the preceding or subsequent paragraphs of this Complaint as if fully set forth herein.

259. These PLAINTIFFS believe, and on such information and belief allege, that each of the aforementioned DEFENDANTS published and negligently, willfully or recklessly, maliciously, or intentionally inflicted false and defamatory statements by LIBEL Per Se concerning CONSULTANT, DENA, CHARLES and JACKSON'S names, businesses and reputations in the community of this Court and across the United States, by making false, malicious and intentional statements about these PLAINTIFFS, CONSULTANT'S employees and these PLAINTIFFS' businesses without just cause with intent of harming these PLAINTIFFS and as a direct and proximate cause of DEFENDANTS' and their agent's actions, these PLAINTIFFS were irreparably harmed by DEFENDANTS and their agents.

260. ROCKSTEP CAPITAL, LLC, ROCKSTEP CAPITAL CORPORATION, ROCKSTEP MERIDIAN AND MERIDIAN BEVCO hired GREGG BORMAN, SR., who is experienced in family entertainment center operations in urban markets, as their agent, consultant and employee in or around June, 2021, to advise them regarding operation of their CENTER.  He first worked in the CENTER in Meridian, MS on or about July 5-9, 2021 and continues to do so today.

261. DEFENDANTS MERIDIAN BEVCO, ROCKSTEP MERIDIAN, ROCKSTEP CAPITAL COMPANY, and ROCKSTEP CAPITAL CORPORATION by and through their agent GREGG BORMAN, SR. and DEFENDANT GREGG BORMAN, SR., individually, willfully and recklessly undertook to publish and disseminate a series of written false and/or disparaging allegations apparent to any reasonable person, alleging these PLAINTIFFS had (1) Criminally Bribed and Corrupted DEFENDANT'S supplier vendors and accepted financial kickbacks from equipment vendors utilized in the CENTER through "Backend Deals", in violation of the AGREEMENT which would be legal civil and criminal fraudulent conduct by theses PLAINTIFFS against DEFENDANTS, a statutory crime in Mississippi, (2) had given the CENTER owners bad business advice regarding layout of the CENTER, (3) had misled, deceived and defrauded MERIDIAN BEVCO and ROCKSTEP MERIDIAN in the design, buildout and operation of the CENTER business, again both legal civil claims and criminal acts in Mississippi (4) that the CENTER arcade games and activities installed by CONSULTANT in the CENTER was not an arcade and whatever games are located there were a business mistake, and (5) that their employees CHARLES and JACKSON were not competent in the family entertainment center business or the Virtual Reality VR business to plan, install, operate or advise the CENTER'S owners on the Virtual Reality VR Games which were installed within the CENTER by CONSULTANT, (6) that CHARLES and JACKSON chose to utilize shoddy, less than state of the art VR equipment then available for the CENTER'S intended use with no reasonable analysis done by them or CONSULTANT as to the cost to value relationship of the equipment compared to the needs of the CENTER.  He inferred (7) that CHARLES and JACKSON were incompetent to properly perform such

services to DEFENDANTS and that such equipment is inferior or unsuited for its intended purpose, business plan and cost budget.

262. On or about July 5, 2021 DEFENDANT GREGG BORMAN, SR. made a public disclosure published and disseminated on his own personal FACEBOOK Page at www.Facebook.com, which is named "GREGG Borman Sr", which page is published and accessible to all billions of FACEBOOK website members and others and then also to his FACEBOOK FEC (Family Entertainment Center) Operators private group page, which is published to over 2200 family entertainment center industry individuals, including CONSULTANT, DENA and TY. He stated that he was traveling to Meridian, MS at the request of ROCKSTEP CAPITAL, LLC or ROCKSTEP CAPITAL CORPORATION, a "PE" (private equity) firm.  He published the following:

> "Another PE group is talking to me about developing an indoor entertainment concept for their 100k square foot former anchor boxes at the malls they own.  Going to Meridian to see what can be done to correct what a previous consultant mislead them into building in one of their malls."

263. On or about July 6, 2021, DEFENDANT GREGG BORMAN, SR. published and disseminated on FACEBOOK FEC (Family Entertainment Center) Operators private group page to over 2200 industry individuals, numerous photos of the Meridian, MS Hype! Adventures CENTER, and in response to questions from FACEBOOK FEC private group members, he stated the following:

> In response to a question from a group member of "where is the arcade?" DEFENDANT responds "the original managing partner didn't put one in.  That was their first mistake.  Layout is not really good for operational flow is another. Everything they put in was purchased from China.  He sold the idea to the Owners on being able to put these into empty anchor boxes on the cheap,"
> "It blows me away on the things some CONSULTANT do and suggest.  I am not a consultant and I do not take any backend deals from suggesting a vendor.  I am helping some PE groups while deciding what I want to do next.  The Laser Tag equipment is from Russia, the carts, tramps, rock wall, adventure course are from China.  They can't adjust the default speed for the go-karts without having a late-night call with a tech in China connecting into their system to change speeds for them.  Even the tables and chairs are from China.  The VR was created by the original guy's kids using four computers and off-the-shelf headsets and software.  There is a lot of refinements needed to make it a better operation."

264. On or about July 8, 2021, DEFENDANT GREGG BORMAN, SR, continued to publish false statements about his own business acumen and abilities on the FACEBOOK FEC group page, claiming falsely that he was responsible for bringing in a trampoline park safety expert to inspect the CENTER, when in fact the DEFENDANT'S Liability insurance carrier demanded such inspection by the expert "Bob Ito" prior to and without any input or suggestions from any of the DEFENDANTS, by publishing the following:

58

"I had Trampoline Park inspection expert Bob Ito (former RM for Sky Zone and gymnastics coach at U of Washington) there all day yesterday…"

265. The wrongful defamation and libel per se of CONSULTANT, DENA, CHARLES and JACKSON by DEFENDANTS' through their agent, GREGG BORMAN, SR. and DEFENDANT GREGG BORMAN, SR., individually, has caused CONSULTANT, DENA, CHARLES and JACKSON to suffer emotionally and financially from the unfavorable impression of these PLAINTIFFS created by DEFENDANTS, and the offensive and embarrassing publications about CONSULTANT, DENA, CHARLES and JACKSON to DEFENDANT'S personal FACEBOOK page accessible to anyone on the World-Wide Web, as well as over 2,200 individual FACEBOOK FEC group members who joined the group and are working in the family entertainment CENTER industry, along with CONSULTANT, DENA and TY as members of this Group. This large business group of individuals is made up of an invitation-only family entertainment center industry business members group (including CONSULTANT, DENA and TY) on the World Wide Web website www.facebook.com and the private group FACEBOOK FEC (Family Entertainment Center) Operators. DEFENDANT GREGG BORMAN, SR'S false, misleading and untrue implications regarding these PLAINTIFFS' good names, characters, reputations and businesses were made with actual malice or reckless disregard for the truth.

266. DEFENDANTS have negatively impacted these PLAINTIFFS' good names, characters, reputation and business to the entire World-Wide Web and this 2200-member family entertainment center industry group forever, with no existing present opportunity to correct these false and damaging publications, as it is abundantly clear to any reasonable person that CONSULTANT and DENA were the sole "consultant" and "managing partner", and CHARLES and JACKSON were "the original guy's kids" referred to by DEFENDANTS as the ones designing, building, owning the trade-name and operating the CENTER. This is clear from DEFENDANTS' published statements on FACEBOOK describing the CONSULTANT and DENA as "consultant", "managing partner" and CHARLES and JACKSON as "the original guy's kids" who performed such corrupt and fraudulent services for DEFENDANTS, as well as publishing extensive photos of the actual CENTER and its activities, published photos of the tradename Hype! Adventures at the CENTER which trade-name is owned by CONSULTANT and is known as HYPE! ADVENTURES exclusive Trade-name and Trademark, and further published the location of the CENTER, published descriptions of the CENTER, and published description of activities and operation of the CENTER on these FACEBOOK Industry Group webpages. These actions clearly identified CONSULTANT, DENA, CHARLES and JACKSON in an offensive and embarrassing light and created an unfavorable impression as to PLAINTIFFS' good names, character, reputations and businesses.

267. Sometime in August 2021, DEFENDANTS recognized their highly damaging and reckless LIBEL Per Se of CONSULTANT, DENA, CHARLES and JACKSON subjecting them to likely substantial compensatory and punitive damages to punish them, and owed to these PLAINTIFFS. GREGG BORMAN, SR. intentionally entered the FACEBOOK website and deleted solely all of the multiple publications referring to anything regarding these PLAINTIFFS or the CENTER he was consulting with, in order to attempt to hide and bury

the lasting offensive written evidence of such damaging publications and reduce his and DEFENDANT'S potential compensatory and punitive damages now due to these PLAINTIFFS. GREGG BORMAN, SR. did not delete any other publications on his or the the FEC Operators group page other than those referencing these PLAINTIFFS and the CENTER.

268. After his malicious conduct and his subsequent deletions of his offensive publications, GREGG BORMAN, SR. then continued his employment and agency with DEFENDANTS in August 2021, and began to post again on these same www.facebook.com accounts identifying the "Hype" branded and licensed location of CONSULTANT in Meridian, MS, indicating his employer DEFENDANTS as licensee of the Hype brand and their urgent need for his expert help in order to fix the problems with the CENTER. Such publication continues to identify CONSULTANT'S Licensee location and defame and damage CONSULTANT, DENA, CHARLES and JACKSON'S good names, characters, reputations and businesses in spite of his previously deleted false statements, as the new publications simply add offensive fuel to the fire GREGG BORMAN, SR. created against theses PLAINTIFFS in his previous offensive and malicious publications.

269. Such damages to CONSULTANT, DENA, CHARLES and JACKSON are extensive, lasting, permanent and virtually impossible to mitigate in spite of the intentional hiding of and deletions of many of DEFENDANTS' publications. Their publication impact was published for and lasted about 30 days and some continue, and were published and available to the billions of users of the world wide web and to over 2,200 individual family entertainment center industry veterans who are the individuals these PLAINTIFFS have worked with and are required to work with in order to rebuild their business and undoubtedly left lasting impressions on those individuals published to regarding CONSULTANT, DENA, CHARLES and JACKSON'S good names, character, reputations and businesses.

270. DEFENDANTS' publications now make it virtually impossible to market these PLAINTIFFS' services to this large industry group or the entire family entertainment center industry without great effort by these PLAINTIFFS to neutralize such damaging publications, because CONSULTANT, DENA, CHARLES and JACKSON have been falsely and recklessly placed in a false defamatory, embarrassing and offensive light, leaving a highly unfavorable impression of these PLAINTIFFS.

271. DEFENDANTS' statements posted on the World-Wide Web and FACEBOOK FEC group page are DEFAMATION Per Se by LIBEL Per Se and are words imputing a want of integrity or capacity, whether mental or pecuniary, in the conduct of these PLAINTIFF'S profession, trade and business, as well as imputing onto CONSULTANT the guilt or commission of multiple acts of the criminal and civil offense of Fraud involving moral turpitude and infamous punishment and therefore do not require proof of actual damages therefrom.

272. DEFENDANTS published or caused these defamatory statements to be published by posting said statements on the aforementioned websites. DEFENDANTS' false and defamatory statements were of and concerning CONSULTANT, DENA, CHARLES and JACKSON, and contained the false statements noted above.

273. DEFENDANTS' false and defamatory statements were published with the intent to harm these PLAINTIFFS' good names and reputations, undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge.

274. DEFENDANTS published these false and defamatory statements with negligence, gross negligence or actual malice with knowledge that the statements were false, or with reckless disregard of whether they were false or not.

275. DEFENDANTS were aware that the statements were defamatory and false, and harm to the PLAINTIFFS character and reputation was apparent to any reasonably prudent viewer or editor of the publications.

276. DEFENDANTS continue to engage in the publication of further defamatory statements of these PLAINTIFFS.

277. Since their posting, these false and defamatory statements published by DEFENDANTS regarding these PLAINTIFFS have remained available to millions of Internet users for about 30 days, and some continue, many of whom may have made copies of the false and defamatory statements and/or distributed them by electronic mail or other means and/or re-posted them to other websites, Internet forums, and message boards, and CONSULTANT, DENA, CHARLES and JACKSON have no means of removing these false and defamatory statements or their impact on people from the Internet.

278. In carrying out the Libelous conduct, DEFENDANTS acted negligently, willfully, maliciously, and/or with reckless indifference to the consequences of their actions against these PLAINTIFFS.

279. As a direct and proximate result of DEFENDANTS' intentional and malicious publication of false and defamatory statements, CONSULTANT, DENA, CHARLES and JACKSON have been and will continue to be damaged and injured in their respective good names, character, businesses and reputations.

280. CONSULTANT, DENA, CHARLES and JACKSON pray that this Court will award damages against DEFENDANTS for defaming and LIBELING Per Se these PLAINTIFFS before a vast number of the general public.

### COUNT 10

### CONSPIRACY TO COMMIT UNLAWFUL PURPOSES AGAINST PLAINTIFFS BY ALL DEFENDANTS

281. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this COMPLAINT as if fully set forth herein.

282. This Count for Conspiracy to commit intentional acts for multiple unlawful purposes against all PLAINTIFFS by the DEFENDANTS is based on the fact that agents ANDY WEINER, MATTHEW JEFFERY, ELISHA D. JEFFERY, GREGG BORMAN, SR., individually and as agents of, as well as other likely agents, of ROCKSTEP CAPITAL 1, ROCKSTEP CAPITAL 2, ROCKSTEP MERIDIAN, and MERIDIAN BEVCO, engaged in multiple intentional acts for unlawful purposes against PLAINTIFFS noted in this COMPLAINT, such that any reasonable person would quickly conclude that due to these numerous acts for unlawful purposes against PLAINTIFFS, that these agents and individuals have made either an express or an implied agreement to commit these illegal acts for unlawful purposes against PLAINTIFFS. Otherwise, without an express or implied agreement to do so, these multiple acts for unlawful purposes by these multiple related individuals and agents of DEFENDANTS would very unlikely have happened in such a short period of time by separate unlawful actions

individually committed by such a large group of individuals and companies. The required agreement for this tortious conduct between these conspirators to have occurred requires no specific agreement be proven under Mississippi law, but rather, may be proven by circumstantial evidence, such as the evidence of multiple declarations and multiple acts of unlawful conduct by the conspirators.  This circumstantial evidence alone (if not able to prove a specific agreement by further discovery in this Case) will show that the facts speak for themselves in firmly establishing that the required implied or express agreement was present for proving this element of this CONSPIRACY Count.  PLAINTIFFS believe that DEFENDANTS' conspiratorial and illegal conduct in this regard is obvious to any reasonable person when viewing this evidence.

283. DEFENDANTS combined in conspiracy with one another to injure PLAINTIFFS and to destroy PLAINTIFFS' good names, characters, reputations and businesses through multiple unlawful purpose actions.  This conspiracy to commit intentional unlawful purposes was agreed upon by these DEFENDANTS in order to better themselves financially and professionally, and to protect their own names, characters, reputations and business, and to blame PLAINTIFFS for the possible, and later actual, negative consequences of and risk of loss to themselves if they were failing with their NEW ROCKSTEP BUSINESS PLAN and NEW MANAGEMENT TEAM in operating the CENTER.  DEFENDANTS knew that they would be held responsible for their failed business actions by their business associates, employees, partners, investors and lenders when they on February 1, 2021, adopted the now failed NEW ROCKSTEP BUSINESS PLAN and hired and managed the failed NEW MANAGEMENT TEAM, which failures have now become obvious to any reasonable person due to the overall continuing business failure of the CENTER over these past 9 months.

284. The conspiracy, agreement and intentional illegal actions were for the purpose of accomplishing the unlawful purposes of defamation using libel per se and slander per se, wrongful invasion of privacy placing one to the general public in a false light, intentional infliction of emotional distress, and intentional fraud and deceitful business practices, already alleged as Counts in this Case, and as a direct and proximate result PLAINTIFFS have suffered irreparable harm, injury and damages.

285. DEFENDANTS conspiracy to commit these illegal actions by agreement among them was undertaken in a group and individual state of mind, which evidences hatred, ill will, or a spirit of revenge.

286. PLAINTIFFS pray that this Court will award damages against DEFENDANTS for Conspiracy and agreement to commit these multiple unlawful purposes against PLAINTIFFS, which were stated, written and published before a vast number of the general public as well as to business associates, customers, potential customers and industry associates of PLAINTIFFS and caused PLAINTIFFS to suffer irreparably from the wrongs of DEFENDANTS noted in the other Counts of this COMPLAINT.

## COUNT 11

### TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS BY MATTHEW JEFFERY

287. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

288. This Count for business disparagement protects the economic interests of CONSULTANT against pecuniary loss.  Under Mississippi law, a claim for tortious interference with business relations requires proof of the following four elements: (1) the acts were intentional and willful against CONSULTANT; (2) the acts were not undertaken by MATTHEW JEFFERY in the exercise of a legitimate interest or right, and were calculated to cause damage to the CONSULTANT in their lawful business to MATTHEW JEFFERY'S benefit; (3) the acts were done with the unlawful purpose of causing damage and loss without right or justifiable cause on the part of  MATTHEW JEFFERY (which constitutes malice aforethought); and (4) MATTHEW JEFFERY'S actions succeeded in actual pecuniary loss and damage to CONSULTANT.

289. In 2019, MATTHEW JEFFERY was introduced to CONSULTANT by ANDY WEINER at DEFENDANT'S company group meeting of all employees of DEFENDANTS in Houston, TX. MATTHEW JEFFERY presented his existing business called Vendors Village, an art and crafts, home accessories and used furniture retail store, offering third party vendors the opportunity to rent space and retail sell their products within Vendor's Village leased kiosks in designated sales floor areas.

290. CONSULTANT presented the plan and features of their successful existing family entertainment center business plan and historical financial results based on their affiliated trampoline-based family entertainment center located in Dothan, Al., which was part of the basis for ANDY WEINER, and ROCKSTEP CAPITAL 1 and ROCKSTEP CAPITAL 2 choosing to contract with CONSULTANT to help build DEFENDANT'S family entertainment center in Meridian, MS.

291. Several months later, ANDY WEINER contacted CONSULTANT asking if CONSULTANT had any use for a used trampoline park which had been purchased by MATTHEW JEFFERY that year after the Houston, TX meeting.  MATTHEW JEFFERY stated in his email to ANDY WEINER and to CONSULTANT that he had, after more thought about it, elected to not further pursue the "trampoline park business" and wished to focus on his existing Vendors Village retail store concept.  He offered to sell the trampoline park equipment for a fixed amount to CONSULTANT.

292. CONSULTANT thought it very odd at the time that MATTHEW JEFFERY had, after CONSULTANT'S presentation in Houston, TX, elected to become engaged in the trampoline park business and purchase such equipment.

293. On January 5, 2021, ANDY WEINER instructed CONSULTANT that MATTHEW JEFFERY and his Vendor's Village team were coming to spend 3 days at the CENTER to evaluate the operation.  CONSULTANT stated they would assist MATTHEW JEFFERY, but thought it very

odd that ANDY WEINER would bring in a team of people totally inexperienced with operating a family entertainment center to evaluate the operation.  CONSULTANT cooperated with MATTHEW JEFFERY and his 4–5-person team during their trip to the CENTER, but found it very odd and very ignorant of them when they appeared to have no knowledge of such an operation as the CENTER, but still assured Joe Malugen about how easy and simple the CENTER was to operate and how they would need no help in understanding or operating this type of business.

294. On or about January 20, 2021, ANDY WEINER and DEFENDANTS called CONSULTANT and proceeded to claim that the CENTER had serious customer safety issues with the equipment based on the report provided by MATTHEW JEFFERY to them.  Joe Malugen, employee of CONSULTANT, responded that he was not aware of any material safety issues, that the safety items they described as present in the CENTER did not make any sense to him, that daily maintenance of equipment was always required and performed on a regular basis and that the CENTER had remarkably few employee or customer safety incidents since opening 6 months prior, which had also been noted by the general liability insurance carrier.  Joe Malugen stated that if he was provided with a list of those safety issues claimed by the inexperienced MATTHEW JEFFERY, that CONSULTANT would gladly respond to those concerns.  No list was ever provided by DEFENDANTS to CONSULTANT.

295. On January 25, ANDY WEINER and DEFENDANTS called CONSULTANT and stated that the CENTER was not a grade "A+" operation, and that MATTHEW JEFFERY and his Vendor's Village team were to assume General Manager duties of the CENTER BY January 31, 2021, in order to fix the problems.  ANDY WEINER asked CONSULTANT to cooperate with MATTHEW JEFFERY and his team as needed to facilitate a smooth transition.  ANDY WEINER wanted CONSULTANT to leave the CENTER by January 31, 2021 with no request for CONSULTANT training of MATTHEW JEFFERY and his team before they assumed control of managing the CENTER.  CONSULTANT thought that statement again very odd in the face of the excellent results for the CENTER during its first 6 months and the fact that the CENTER was projected to have above projection Sales of $275,000 the then current month of January, as well as the fact that neither MATTHEW JEFFERY nor his team had any experience managing a family entertainment center with as many different physical activity elements and safety concerns due to the varied physical activity involved with most of the CENTER activities.

296.  It became apparent to CONSULTANT at that time that MATTHEW JEFFERY had made materially false statements about CONSULTANT that was now impacting the CONSULTANT'S business relationship with ANDY WEINER and the other DEFENDANTS.

297. CONSULTANT left the CENTER ON January 31, 2021 and has not returned.

298. The evidence will show that the CENTER exceeded financial expectations and was operating exceptionally well with few operational or safety problems for its first 6 months of operation, while CONSULTANT was providing services to DEFENDANTS.  The evidence will show that the CENTER has been suffering and declining in all operational, financial and safety business aspects since MATTHEW JEFFERY assumed control of the CENTER and

implemented his plan to "fix" the CENTER in January 2021.  The evidence will show that MATTHEW JEFFERY made intentional false statements to ANDY WEINER and other DEFENDANTS about CONSULTANT, calculated to cause damage to the CONSULTANT in their lawful business and to financially and professionally better himself at CONSULTANT'S expense. CONSULTANT believes that further discovery will reveal other materially false statements made by MATTHEW JEFFERY which contributed to this tortious unconscionable series of actions.

299. The tortious acts were designed for MATTHEW JEFFERY'S benefit in securing employment and short and long-term financial incentives for himself and his team of family and existing employees from his other existing business, his Vendors Village store operation. The acts of MATTHEW JEFFERY were done with the unlawful purpose of causing damage and loss without right or justifiable cause on his part.  Such acts were with malice, and resulted in loss and damage to CONSULTANT'S existing and future business relationship with ANDY WEINER and other DEFENDANTS as well as other participants and potential customers of CONSULTANT in the family entertainment center industry business.

300. MATTHEW JEFFERY'S illegal actions and statements to other DEFENDANTS and others were undertaken in a state of mind which evidences hatred, ill will, or a spirit of revenge.

301. As a direct and proximate result of MATTHEW JEFFERY'S' statements and actions above, CONSULTANT has been and will continue to be irreparably damaged and injured in its pursuits in the family entertainment center business.

302. CONSULTANT prays that this Court will award damages against MATTHEW JEFFERY for intentionally irreparably damaging the CONSULTANT due to his tortious interference in an existing business relationship.

## COUNT 12

### PRELIMINARY AND PERMANENT INJUNCTION

303. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

304. Upon information and belief, some or all of the improper and unlawful conduct of DEFENDANTS alleged above is continuing and will continue in the future absent injunctive relief from this Court, and PLAINTIFFS will continue to be damaged by the same.

305. In the absence of the entry of a preliminary and permanent injunction by the court, PLAINTIFFS will suffer serious and irreparable harm and injury, including but not limited to damage of their respective good names, characters, reputations and business.

306. The entry of a preliminary and permanent injunction will not unduly harm or burden DEFENDANTS because they are required as a matter of law to refrain from disseminating defamatory and false light statements regarding PLAINTIFFS.

307. Public policy favors the entry of a preliminary and permanent injunction because, inter alia, such relief will prevent unlawful conduct and will preserve and protect PLAINTIFFS' respective good names, characters, reputations and business.

308. PLAINTIFFS pray that this Court will enter a Preliminary Injunction preventing the DEFENDANTS and their agents from continuing to harm PLAINTIFFS' good names, character, reputation and business in the manner set out above, in that PLAINTIFFS have no other remedy in law or in equity and will be irreparably harmed should said Injunction not be issued.

309. PLAINTIFFS pray for such other relief as they may be entitled.

**COUNT 13**

**PUNITIVE DAMAGES**

310. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

311. DEFENDANTS' aforementioned conduct was conscious, deliberate, intentional, and/or recklessly negligent in nature.

312. DEFENDANTS have exhibited a pattern and conspired plan of false, deceitful, vile, tortious conduct over many months with many individuals employed by them and agents of the DEFENDANT companies and ANDY WEINER, and have shown a desire and conspired plan to deceive, disarm and lower the caution and defenses of their business customers and acquaintances during business negotiations by falsely touting their own constant adherence to their 25 "Rockstep Ways" for reputable and honest conduct of business affairs which they loudly recommend to all business persons.

313. DEFENDANT'S conduct was egregiously insidious, treacherous and crafty and was a breach of the implied covenant between these parties of good faith and fair dealing in their relationships.

314. DEFENDANTS' aforementioned conduct was undertaken in a state of mind, which evidences hatred, ill will, or a spirit of revenge in direct opposition to the tenets of their touted 25 "Rockstep Ways."

315. DEFENDANTS' aforementioned conduct evidences a continuous and conscious disregard for the rights of other persons and has caused and has presently caused and has a great probability of causing additional substantial harm.

316. As a direct and proximate result of these willful and wrongful acts of DEFENDANTS, the PLAINTIFFS have suffered irreparable damages in excess of the minimum jurisdictional limits of this Court. By reason of the above described willful, wrongful, intentional, conscious, and recklessly negligent acts of DEFENDANT, the PLAINTIFFS are also entitled to and pray this Court to award them substantial punitive damages for this egregiously insidious conduct and attorneys' fees as this Court shall determine.

## COUNT 14

### FAILURE TO PROVIDE ACCESS TO DEFENDANT'S BOOKS AND RECORDS

317. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

318. CONSULTANT, as Licensor, on July 1, 2019, entered into with DEFENDANT ROCKSTEP MERIDIAN, which ROCKSTEP subsequently assigned to DEFENDANT MERIDIAN BEVCO, the TRADE-NAME LICENSING AGREEMENT for the use of CONSULTANT Licensor's tradename and trademark "HYPE! ADVENTURES" in the CENTER with certain limitations on usage of the Tradename and Trademark within a defined geographic Territory including Lauderdale County, MS.  DEFENDANTS have continued to operate this CENTER since September 2020. DEFENDANTS are limited in their continued use of this tradename and trademark by the requirement to provide books and records of MERIDAN BEVCO to CONSULTANT by the terms and conditions of Section 6 of this TRADE-NAME LICENSE AGREEMENT.  Section 6 thereof provides as follows:

> 6. **Inspection. Licensor, or its nominee, shall have access to the Business during normal business hours and to books and records of Licensee for the purpose of ensuring compliance with this Agreement.**

319. After demand for access by CONSULTANT of the business premises, such books and records, DEFENDANTS have failed to provide such access.  After demand by CONSULTANT to access the Business consisting of the CENTER premises, during normal business hours, DEFENDANTS have instructed CONSULTANT to not enter the business CENTER premises in spite of CONSULTANT'S right to do so.

320. CONSULTANT hereby demands that this Court order DEFENDANTS to provide access to the CENTER premises as CONSULTANT is entitled, and full access to all books and records of DEFENDANT MERIDIAN BEVCO and ROCKSTEP MERIDIAN.

## COUNT 15

### BREACH OF CONTRACT FOR MISUSE OF CONSULTANT'S TRADENAME AND TRADEMARK AND DEMAND TO TERMINATE TRADE-NAME LICENSE AGREEMENT

321. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

322. PLAINTIFF CONSULTANT, as Licensor, on July 1, 2019, entered into with DEFENDANT ROCKSTEP MERIDIAN, as Licensee, the TRADE-NAME LICENSING AGREEMENT for the use of CONSULTANT Licensor's trade-name and trademark "HYPE! ADVENTURES" in the CENTER, with certain limitations on usage of the Tradename and Trademark in a defined geographic Territory including Lauderdale County, MS.  ROCKSTEP MERIDIAN subsequently assigned this agreement to DEFENDANT MERIDIAN BEVCO, as Licensee, on June 4, 2020.

DEFENDANTS have continued to operate this CENTER premises and business since September 2020 using CONSULTANT'S Trade-Name and Trademark "Hype! Adventures." DEFENDANTS are limited in their continued legal use of this tradename and trademark by the requirement therein to not engage in any License Termination action by MERIDIAN BEVCO under the terms and conditions of Section 8 of this TRADE-NAME LICENSE AGREEMENT.  Section 8 thereof provides as follows:

8. Termination.

(a)     Licensee may not terminate this Agreement.

(b)     **The license rights granted hereunder may be terminated by Licensor upon immediate notice without the opportunity to cure should any of the following events occur:**

(i)     If Licensee shall: (A) admit in writing its inability to pay its debts generally as they become due; (B) file a petition in bankruptcy or a petition to take advantage of any insolvency act; (C) make an assignment for the benefit of its creditors; (D) consent to the appointment of a receiver of itself or of the whole or any substantial part of its property; (E) on a petition in bankruptcy filed against it, be adjudicated as bankrupt; (F) file a petition or answer seeking reorganization or arrangement under the bankruptcy laws or any other applicable law or statute; (G) become subject to a final order, judgment or decree entered by a court of competent jurisdiction appointing, without the consent of petition or answer seeking reorganization or arrangement under the bankruptcy laws or any other applicable law or statute; (G) become subject to a final order, judgment or decree entered by a court of competent jurisdiction appointing, without the consent of Licensee, a receiver of Licensee or of the whole or any substantial part of its property or approving a petition filed against Licensee seeking reorganization or arrangement of Licensee under the bankruptcy laws or any other applicable law or statute; or

(ii)     Licensee shall fail to open the retail store within 18 months of the date of this Agreement or cease the use of the Name in the Business within the Territory for a period of 1 year after opening the retail store, **fail or refuse to perform any other obligation created by this Agreement or Licensee breaches any term or condition of this Agreement or any other agreement between Licensee and Licensor or its affiliates**; or

(iii)     **Licensee has made any misrepresentations relating to the acquisition of the license granted herein, or Licensee**

**or any of Licensee's shareholders, officers, directors, or managing personnel engages in conduct which reflects unfavorably on the Name or upon the operation and reputation of the Licensor's business;** or

(iv)    Licensee or any of Licensee's shareholders, officers, directors, or managing personnel is convicted of a felony or any other criminal misconduct which is relevant to the operation of the business of Licensee.

**In the event of termination of this License for any reason, Licensee shall immediately cease all use of the Name and shall not thereafter use any name, mark or trade name similar thereto. Termination of the license under the provisions of this Section 8 shall be without prejudice to any rights which Licensor may otherwise have against Licensee.**

324. DEFENDANTS are limited in their continued use of this trade-name and trademark by terms and conditions of Section 8-b-iii of this Agreement which states that DEFENDANT "Licensee or any of Licensee's shareholders, officers, directors, or managing personnel engages in conduct which reflects unfavorably on the Name or upon the operation and reputation of the Licensor's business."

325. The TRADE-NAME LICENSE AGREEMENT allows PLAINTIFF CONSULTANT to demand the termination of DEFENDANT'S use of CONSULTANT'S tradename "Hype! Adventures" in the CENTER if DEFENDANT'S actions subsequent to execution of this Agreement reflect unfavorably on the CONSULTANT Licensor's name, operation or reputation of Licensor CONSULTANT'S business.  By reason of the allegations against DEFENDANTS' actions in the alleged tortious and conspiracy Counts set out herein, which were willful, wrongful, intentional, conscious, and reckless acts of ROCKSTEP MERIDIAN and MERIDIAN BEVCO, these actions clearly reflect unfavorably on the CONSULTANT'S name, business operation and reputation.  The CONSULTANT hereby demands and prays that this Court will order the termination of the TRADE-NAME LICENSE AGREEMENT and that these DEFENDANTS immediately cease all use of the Name "Hype! Adventures" and that these DEFENDANTS shall not thereafter use any name, mark or trade name similar thereto. Termination of the license under the provisions of this Section 8 of the TRADE-NAME LICENSE AGREEMENT shall be without prejudice to any rights which CONSULTANT Licensor may otherwise have against Licensee MERIDIAN BEVCO.  CONSULTANT further demands that this Court order these DEFENDANTS to remove all evidence of the use of said "Hype! Adventures" trade-name and trademark.

326. CONSULTANT hereby demands and prays this Court to award damages to CONSULTANT for the financial benefit of their agreement with MERIDIAN BEVCO now lost due to ending of use of the trade-name in the Center, which has continuing value and benefit to CONSULTANT through continuing public exposure and use of this TRADE-NAME in the CENTER among the family entertainment center industry and the general public.

**COUNT 16**

**BREACH OF CONTRACT FOR FAILURE TO PROVIDE FINANCIAL STATEMENTS AND MONTHLY EBITDA PAYMENTS**

327. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

328. The AGREEMENT between the Parties, Section 6 requires DEFENDANTS ROCKSTEP MERIDIAN and MERIDIAN BEVCO to provide financial records of the CENTER to CONSULTANT providing the "net monthly earnings" calculation and pay 10% of the "net monthly earnings" as consulting fees during the first 18 months of CENTER operations within 30 days following each month. These DEFENDANTS have no basis for not providing these records or fees to CONSULTANT. These DEFENDANTS have never provided any of these records or fees to CONSULTANT to determine such fees, after promising such information would be forthcoming for several months.

329. Section 6 of the AGREEMENT provides for additional consulting fees to be paid to CONSULTANT as follows:

 6. **OPERATIONAL CONSULTING DUTIES AND PAYMENT TERMS**

 (a)  *Operational Consulting Duties.* For a period of eighteen (18) months following the Opening Date (the "Operational Consulting Period"), Hype Adventures shall be available for both on site and remote consultation with Rockstep, the Operating Tenant and their employees at the Rockstep Park. This consultation ("Operational Consulting Duties") shall include giving advice on all business matters related to the operation, marketing, performance and running of the Rockstep Park. It is understood by both Parties that this shall include some reasonable visits to the Rockstep Park and while the Parties agree that a visit by Hype Adventures to the Rockstep Park once every week should be reasonable, the amount of visits required may actually decrease or increase based on the stabilization of operation, level of quality control, changing circumstances at the Rockstep Park and scheduling. Other than travel costs, the fees paid by Rockstep will not increase if more frequent visits are required. Any visits required beyond the once a week shall be reasonably requested by Rockstep or the Operating Tenant and subject to scheduling, shall be honored by Hype Adventures.

 (b)  ***Additional Payment for Operational Consulting Duties.*** **During the Operational Consulting Period, and in consideration of Hype Adventures' performance of the Operational Consulting Duties, the Operating Tenant shall pay Hype Adventures 10% of the net monthly earnings from the Rockstep Park (before income taxes and depreciation). Such amounts will be paid to Hype Adventures monthly for the previous**

**month's operations, within 30 days of the end of any month being computed. This obligation shall expire at the end of the Operational Consulting Period.**

330. The TRADE-NAME LICENSE AGREEMENT provides in Section 6, that CONSULTANT has a right to all books and records of MERIDIAN BEVCO: as follows:

> 6. Inspection. Licensor, or its nominee, shall have access to the Business during normal business hours and to books and records of Licensee for the purpose of ensuring compliance with this Agreement.

331. CONSULTANT demands that this Court order DEFENDANTS to immediately provide such records and continue to do so promptly for the 18-month term for monthly payments set out in the AGREEMENT.

332. CONSULTANT further demands that this Court order that DEFENDANTS immediately pay to CONSULTANT any Net Monthly Earnings/EBITDA amounts established by those records and continue such payments for the 18-month term of the AGREEMENT and for a judgement against DEFENDANTS for such amount.

## COUNT 17

### BREACH OF CONTRACT FOR FAILURE TO PAY CONSULTING FEES

333. PLAINTIFFS restate and reaver each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

334. On July 1, 2019, CONSULTANT and DEFENDANT ROCKSTEP MERIDIAN entered into that certain AGREEMENT for CONSULTANT to assist in the design, layout, purchase of fixtures and equipment, installation thereof and operation of DEFENDANT'S family entertainment CENTER in Meridian, MS, named "Hype! Adventures." CONSULTANT agreed to provide its services under said AGREEMENT for the consideration set out therein. Section 4 of said AGREEMENT provides:

> **4.    PAYMENT FOR PRELIMINARY CONSULTING DUTIES, LIMITED ASSEMBLY AND DEVELOPMENT CONSULTING DUTIES.**
>
> Rockstep hereby agrees to pay unto Hype Adventures, One Hundred Thousand Dollars ($100,000.00) for the Preliminary Duties, Limited Assembly and Development Consulting Duties provided for herein, as follows:
>
> a)    Fifty-thousand dollars ($50,000.00) to be paid on the date of this Agreement; and

b)     If the total actual pre-opening expenditures incurred by Rockstep in connection with the completion and opening of the Rockstep Park (excluding Rockstep's cost relating to its initial construction obligations and any additional improvements to the leasehold outside the control of Consultant) do not exceed the original budgeted amount approved by Rockstep by more than 5%, the remaining fifty-thousand dollars ($50,000.00) shall be paid to Hype Adventures 60 days after the Rockstep Park's opening date to the public as determined by Rockstep (the Opening Date").

335.  CONSULTANT was paid a total of $75,000 of the total fee of $100,000 provide in Paragraph 4 of the AGREEMENT.  CONSULTANT was to be paid the remaining sum of $25,000 to provide these services.  DEFENDANT ROCKSTEP MERIDIAN agreed therein to pay CONSULTANT completely within 60 days after opening of DEFENDANT'S CENTER. A condition of said payment was that the cost of building the CENTER not exceed 5% of the original budgeted amount to build such CENTER.  This agreement anticipated CONSULTANT'S having oversight of the entire construction process including the CENTER equipment construction, fixtures construction and real estate construction. DEFENDANT refused to comply with this part of the agreement after the project began and demanded that their construction employees oversee said real estate construction without oversight from CONSULTANT.  CONSULTANT protested this arrangement because CONSULTANT no longer then controlled the costs of said construction as provided in the Agreement. CONSULTANT stated to DEFENDANT that CONSULTANT had no control of this condition of the Agreement and CONSULTANT would not continue providing services under the Agreement unless CONSULTANT was assured that the $25,0000 payment to CONSULTANT would be made regardless of DEFENDANT controlling the costs of real estate construction. DEFENDANT assured CONSULTANT both in writing and verbally that said full payment of $100,000 would be made as set out in the Agreement and that the condition to withhold payment from CONSULTANT if the cost of construction exceeded 5% of the agreed budget was completely waived because DEFENDANT recognized that CONSULTANT had no control of what was spent by DEFENDANT on construction.  CONSULTANT was paid $50,000 upon execution of the AGREEMENT.  CONSULTANT requested payment of half the remaining unpaid $50,000 to DEFENDANT at that time and was paid $25,000 by DEFENDANT. DEFENDANT has failed to pay CONSULTANT for said remaining payment totaling $25,000 after demand by CONSULTANT. CONSULTANT continued providing services under this agreement thereafter when DEFENDANT assured CONSULTANT that the Agreement was amended to obligate Defendant to pay the $25,000 and that said payment would be forthcoming to CONSULTANT.

336.  CONSULTANT has demanded payment in writing from DEFENDANT in the past but such amounts remain unpaid by DEFENDANT.  CONSULTANT hereby demands judgement

against DEFENDANT ROCKSTEP MERIDIAN for said amount of $25,000 in addition to interest, attorney's fees and costs.

## COUNT 18

### BREACH OF CONTRACT FOR FAILURE TO REIMBURSE CONSULTANT'S REASONABLE EXPENSES IN SERVICE TO DEFENDANTS

337. CONSULTANT restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

338. On July 1, 2019, CONSULTANT and DEFENDANT ROCKSTEP MERIDIAN entered into that certain AGREEMENT for CONSULTANT to assist in the design, layout, purchase of fixtures and equipment, installation thereof and operation of DEFENDANTS' family entertainment CENTER in Meridian, MS named "Hype! Adventures." CONSULTANT agreed to provide its services under said agreement for the consideration set out therein. Section 5 of said AGREEMENT provides:

    5.    <u>TRAVEL AND MISCELLANEOUS EXPENSES</u>

**Rockstep hereby agrees that all reasonable travel, food and lodging expenses, either during Preliminary Duties, Development Consulting Duties and Limited Assembly, and Operational Consulting Duties, as provided herein, as well as any other reasonable miscellaneous expenses incurred by Hype Adventures in providing any of the services herein or expenses needed to purchase materials or hire laborers necessary for Hype Adventures to complete any of the services herein (provided same are approved in advance by Rockstep), shall be paid by Rockstep within 14 days of delivery of invoices to Rockstep evidencing such expenses.**

339. In complying with said AGREEMENT, CONSULTANT is to be reimbursed for all reasonable and necessary expenses incurred in providing these services. DEFENDANT agreed therein to reimburse CONSULTANT completely for all said expenses within 14 days after presentation to DEFENDANT of invoice evidence of such expenses. CONSULTANT submitted such expenses to DEFENDANT and provided evidence thereof over several months of 2019 and 2020 and 2021. DEFENDANT has failed to reimburse DEFENDANT for its said expenses totaling $26,609.11, since invoices were presented to DEFENDANT on February 12, 2021 and again on April 19, 2021. CONSULTANT has demanded payment in writing from DEFENDANT in the past but such amounts remain unreimbursed and unpaid by DEFENDANT. CONSULTANT hereby demands and prays that this Court grant judgement against DEFENDANT ROCKSTEP MERIDIAN for said amount of $26,609.11, in addition to interest, attorney's fees and costs.

## COUNT 19

## PROMISSORY ESTOPPEL DUE TO PLAINTIFF'S REASONABLE RELIANCE TO THEIR DETRIMENT ON PROMISES OF DEFENDANTS

340. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this Complaint as if fully set forth herein.

341. After opening of the CENTER, the AGREEMENT between the Parties required CONSULTANT to consult with DEFENDANT ROCKSTEP MERIDIAN'S designated employees or agents to assist them in managing the CENTER on a part-time basis. It did not require that CONSULTANT assume full-time general daily management of the CENTER as the General Manager for MERIDIAN BEVCO. These DEFENDANTS requested CONSULTANT to assume the full-time General Manager position in the CENTER on or about October 30, 2020 until January 31, 2021. CONSULTANT was not seeking any continued employment as CONSULTANT was already performing consulting services at the same time under the AGREEMENT.

342. In order to induce CONSULTANT to assume this position, DEFENDANTS assured CONSULTANT that DEFENDANTS would pay DEFENDANTS the remaining outstanding $25,000 unpaid of the $100,000 consulting fee provided for in the AGREEMENT despite the construction cost of the CENTER exceeding 5% of the original budget amount, due to the fact that CONSULTANT did not have full control of the construction project costs. In addition, DEFENDANTS told CONSULTANT that they would pay the currently undetermined monthly 10% of "Net Earning" EBITDA of the CENTER consulting fee, and any reasonable travel, food and entertainment expenses incurred and outstanding by CONSULTANT, as well as any such expenses incurred while CONSULTANT acted as General Manager of the CENTER. DEFENDANTS should have reasonably expected such promises to induce action or forbearance of a substantial character on the part of the CONSULTANT. It was reasonably foreseeable that CONSULTANT would rely on those clear and definite promises when it assumed the General Manger position, because CONSULTANT did not otherwise ask for any reasonable salary compensation in consideration for acting in that position, which was anticipated to be 3-4 months. CONSULTANT relied substantially on these promises to its detriment and fulfilled their agreed position as General Manager of the CENTER for about 3 months.

343. DEFENDANTS have failed to pay any amounts promised to CONSULTANT or provide required business records to determine such amounts, after demand therefor and after submission of invoices to DEFENDANTS evidencing reasonable travel, food and entertainment expenses incurred under the AGREEMENT or under the subsequent agreement to act as General Manager. Such amounts total $51,609.11, not including amounts which have yet to be determined due to DEFENDANTS failure to provide access to the books and records of MERIDIAN BEVCO and ROCKSTEP MERIDIAN.

344. CONSULTANT relied to its detriment on these promises of DEFENDANTS and has been damaged by DEFENDANT'S breach of these promises.

345. DEFENDANTS and/or their agents made these promises in order to induce CONSULTANT to take and/or forego certain actions. The promises made by DEFENDANTS and/or their representatives were reasonably calculated to induce CONSULTANT to take and/or forego certain actions. CONSULTANT'S reliance upon DEFENDANTS' promises was reasonably foreseeable to DEFENDANTS.

346. CONSULTANT, in fact, relied on each and every one of DEFENDANTS' promises and has taken definite and substantial action in reliance on DEFENDANTS' promises to its detriment.

347. DEFENDANTS' promises were the proximate cause of significant damages to CONSULTANT, which are in excess of the minimum jurisdictional limit of this Court. In order for injustice to be avoided, the CONSULTANT prays and the Court must enforce the promises to pay $51,609.11, plus the undetermined consulting fees, and interest on such amounts, made to CONSULTANT by DEFENDANTS and/or their agents.

**COUNT 20**
**PARTIAL BREACH OF THE CONSULTING AGREEMENT AND DEMAND FOR SPECIFIC PERFORMANCE**

348. PLAINTIFFS restate and reaver each and every allegation contained in the preceding and subsequent paragraphs of this COMPLAINT as if fully set forth herein.

349. Based on the above and the foregoing, DEFENDANTS ROCKSTEP MERIDIAN AND MERIDIAN BEVCO have partially breached the terms of the AGREEMENT, as DEFENDANTS have unpaid financial payments for CONSULTANT'S past services and books and records reporting obligations to CONSULTANT, including production of records and reports and as yet undetermined consulting fees payable to CONSULTANT which cannot be determined until the end of the term of the AGREEMENT in the year 2022. CONSULTANT is ready, willing and able to comply with the terms of the AGREEMENT, and prays that this Court will order DEFENDANTS to pay all amounts now due and determined to be owed by DEFENDANTS to PLAINTIFFS in the AGREEMENT and to order the DEFENDANTS to provide all books and records of MERIDIAN BEVCO and ROCKSTEP MERIDIAN in order to determine these further amounts owed to CONSULTANT, and to protect CONSULTANT'S trade-name, and to specifically perform the remainder of their obligations under the AGREEMENT.

**DEMAND FOR TRIAL BY JURY**

349. PLAINTIFFS are entitled to and hereby respectfully demand a trial by jury.

**RESERVATION OF RIGHTS**

350. Discovery is on-going and will expand quickly.  Therefore, PLAINTIFF reserves the right and anticipates to assert additional COUNTS and claims and/or affirmative defenses as necessary should they be revealed by further extensive discovery that is anticipated herewith.

75

WHEREFORE, PLAINTIFFS demand judgment from these DEFENDANTS, and the other, as yet, unknown DEFENDANTS as follows:

A. For entry of a Preliminary and Permanent Injunction preventing DEFENDANTS, and the other, as yet, unknown DEFENDANTS from disseminating any public false light and false defamatory statements regarding PLAINTIFFS;

B. For an entry requiring DEFENDANTS, and the other, as yet, unknown DEFENDANTS, to remove the false and defamatory statements written regarding PLAINTIFFS, published by DEFENDANTS, and the other, as yet, unknown DEFENDANTS from the World-Wide Web Internet websites and as yet unknown other publications;

C. For an entry requiring DEFENDANTS, and the other, as yet, unknown DEFENDANTS, to post an itemized specific retraction of all of the false and defamatory statements published by DEFENDANTS, and the other, as yet, unknown DEFENDANTS, as well as a specific written apology itemizing the false statements to PLAINTIFFS to be published in the Meridian Star Newspaper, Meridian, MS, the FEC Operators Facebook Page on social media website Facebook.com, the Hype Adventures website and the Hype Adventures Meridian Facebook page, and to be televised on WTOK, WMDN, and WGBC television stations in Lauderdale County, MS;

D. For an entry of judgement for compensatory damages of $25,000 for unpaid consulting fees, plus the undetermined variable consulting fees up to date for the remaining unpaid consulting fees, for $26,609.11 for unreimbursed reasonable expenses pursuant to the AGREEMENT, and compensatory damages for the extensive tortious actions of DEFENDANTS in excess of $2,000,000.00;

E. For an entry of recission and termination of the TRADE-NAME LICENSE AGREEMENT and the right of use of the trade-name and trademark "Hype! Adventures" in any way, in the future by DEFENDANTS;

F. For an entry ordering Specific Performance of the AGREEMENT and access to the books and records of MERIDIAN BEVCO and ROCKSTEP MERIDIAN in order to protect the "Hype! Adventures" trade-name and in order to calculate the amount of consulting fees now due and payable to CONSULTANT under the variable monthly consulting fee provided for in the AGREEMENT;

G. For an entry of punitive damages against all DEFENDANTS to punish and deter DEFENDANTS in the future for all of these multiple conspiratorial, tortious and illegal actions by all DEFENDANTS in an amount in excess of $6,000,000;

H. For costs, interest and attorney's fees, as PLAINTIFFS have been forced to retain attorneys and incurred costs for which DEFENDANTS are liable; and,

I. For any other relief that this court deems just and appropriate.

Respectfully Submitted this the 7th day of January, 2022.

Tyeasha Bell Lindsey; Hype Adventures, LLC,
an Alabama Limited Liability Company;
Dena M. Malugen, Jackson Hayes Malugen,
a minor child, by his natural parents and
legal guardians, Joe and Dena Malugen;
Charles Thomas Malugen, a minor child,
by his natural parents and legal guardians,
Joe and Dena Malugen, PLAINTIFFS
BY:

K. Dustin Markham (MSB No. 103782)
1208 22nd Avenue
P.O. Box 5471
Meridian, MS 39302
Telephone: (601) 207-5160
Facsimile: (601) 485-6571
ATTORNEY FOR PLAINTIFFS

OF COUNSEL:
K. Dustin Markham (MSB No. 103782)
1208 22nd Avenue
P.O. Box 5471
Meridian, MS 39302
Telephone: (601) 207-5160
Facsimile: (601) 485-6571
ATTORNEY FOR PLAINTIFF

77

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do hereby certify that as of this date I have served pursuant to Rule 4 of the Mississippi Rules of Civil Procedure a true and correct copy of the above and foregoing instrument to:

Meridian Bevco, LLC, d/b/a Hype! Adventures
Bobby Watson, General Manager
1740 Bonita Lakes Circle
Meridian, MS 39301

Rockstep Meridian Entertainment, LLC
Bobby Watson, General Manager
1210 Bonita Lakes Circle,
Meridian, MS 39301

Rockstep Capital, LLC
1445 North Loop West
Ste 625
Houston, Texas 77008

Rockstep Capital Corporation
1445 North Loop West
Ste 625
Houston, Texas 77008

Andy Isaac Weiner
1445 North Loop West
Ste 625
Houston, TX 77008

Gregg Borman, Sr.
2230 Hillcrest Drive
Tracy, CA 95377

Matthew Jeffery
7301 W. Orell Road
Louisville, KY 40272

Elisha D. Jeffery
8803 Royal Oak Drive
Louisville, KY 40272

This, the 7th day of January 2022.

K. Dustin Markham

This document was prepared by:
K. Dustin Markham (MS Bar No. 103782)
Attorney at Law
1208 22nd
Avenue
P.O. Box 5471
Meridian, MS 39302
Phone: (601) 207-5160
Fax: (601) 485-6571

79